COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| THE STATE OF TEXAS, | § | No. 08-19-00215-CR |
| Appellant, | § | Appeal from the |
| v. | § | County Criminal Court at Law No. 4 |
| ARMANDO ZUBIATE | § | of El Paso County, Texas |
| Appellee. | § | (TC# 20180C02815) |

## **O P I N I O N**

This is a State's appeal from a trial court's order suppressing evidence following a traffic stop. The trial court concluded that a policeman's reliance on a 911 report that an impaired person was behind the wheel of a car was insufficient to allow the officer to locate and then follow the vehicle. The trial court also found, however, that while following the car, the police officer witnessed several traffic violations (which are indisputably shown on a dash-cam video). In our view, this latter finding controls the disposition of the appeal and we reverse the trial court's order granting the motion to suppress and remand the cause for further proceedings consistent with this opinion.

# I. BACKGROUND

The State charged Appellee, Armando Zubiate, with driving while intoxicated with a blood alcohol concentration level of 0.15 or more. Zubiate filed a pretrial motion to suppress all evidence obtained after a traffic patrol officer pulled him over in a traffic stop.

## A. Trial Court Hearing

The State presented El Paso Police Officer Bernie Munoz as its sole witness during the hearing on Zubiate's motion to suppress. While working the night shift in March 2018, Officer Munoz responded to a dispatch alert relaying that a Whataburger employee called 911 to report that the driver of a black Porsche with a specific license plate number was "down at the wheel" on the restaurant premises.[1] Given the time of night, Officer Munoz worried that the driver was intoxicated or medically impaired, and he responded out of a concern for safety. The Porsche left the restaurant before Officer Munoz arrived; however, Officer Munoz encountered the vehicle on the road less than a mile away, because the Whataburger employee called 911 a second time to report the Porsche's direction of travel.

At the hearing, Officer Munoz identified the contents of a DVD as from what his dash-cam recorded on the evening of Zubiate's arrest, and the State played the video as he testified. As Officer Munoz followed the Porsche, he explained that the dash-cam video depicted the vehicle committing the traffic violation of driving on top of the white solid lane marker, which indicated that the driver was not "good to be driving." His dash-cam next recorded the driver making a wide

---

[1] The State did not present an audio recording or written transcript of the 911 call during the hearing; however the State represented that an employee from Whataburger called 911 to report that the driver of a black Porsche bearing a specific license plate was passed out in the restaurant's drive through lane. Although the trial court stated that it would not consider any additional evidence submitted after the suppression hearing concluded, the State later presented an audio recording of the 911 call to the trial court in a Bill of Exception. This Court does not need to address whether the trial court erred by failing to consider the 911 call, and the State did not present the issue in its opening brief.

2

right-hand turn, crossing the double yellow line of the roadway, and driving in a lane of oncoming traffic. Officer Munoz initiated a traffic stop at this point, because Zubiate committed the traffic violations of (1) crossing a solid white lane divider, (2) making a wide right hand turn, (3) crossing the double yellow line dividing the direction of the travel of traffic, and (4) driving in the lane of oncoming traffic.

After Officer Munoz activated his emergency lights, Zubiate continued to fail to maintain a single lane of traffic, and he did not activate his turn signal before moving from the left to the right lane. Once pulled over, Officer Munoz informed Zubiate that 911 received a call about a driver at Whataburger, and a passenger in the Porsche affirmed that the 911 call concerned Zubiate.[2] Officer Munoz informed Zubiate that he initiated the traffic stop because Zubiate committed traffic violations. Zubiate stated that he drank two beers prior to driving.

Defense counsel did not cross-examine Officer Munoz concerning the traffic violations but rather questioned him only about his knowledge of the 911 call and the circumstances at Whataburger. Defense counsel inquired, "So is that what you do? You just chase citizens of our community for no reason?" Officer Munoz responded that he did not chase Zubiate. Rather, the officer claimed his experience as a four-year veteran traffic division officer, with over 100 driving while intoxicated arrests, taught him that a driver may be "down at the wheel" because they are intoxicated. His duty was to observe vehicles and remove impaired drivers from the road.

At the close of the hearing, the trial court stated that if law enforcement had "been patrolling and they'd seen this activity of the Porsche . . . without anything else, they probably had at least some reasonable suspicion to stop." But once Zubiate left the Whataburger parking lot,

---

[2] Officer Munoz's supplemental arrest report indicated that Zubiate had "vomited all over his person and the inside of his vehicle."

the trial court concluded, "the object of the welfare or safety check [was] no longer present" and law enforcement had no "reasonable suspicion to continue with the search."

**B. Trial Court's Findings of Fact and Conclusions of Law**

The trial court thereafter entered an order granting the motion to suppress, which found the following findings of fact:

1.  On March 29, 2018, El Paso Police Officers were dispatched and responded to a 911 call informing of a "subject down at the wheel."

2.  An employee of Whataburger generated the call because there was a person down at the wheel somewhere in the parking lot of the establishment.

3.  The exact location of the vehicle was unknown. There was no testimony provided by officers of whether the vehicle was improperly parked or impeding the drive-through because the responding officers never saw the vehicle at the scene.

4.  Before the police arrived at the Whataburger, they were notified by police dispatch that the vehicle had left the scene.

5.  Officers then began a search for the vehicle to effectuate a "welfare check."

6.  There was no reasonable suspicion at this point and no welfare check factors, since the person was no longer "down at the wheel."

7.  At this point, there was no reason for the officers to search for the vehicle when they had no reasonable suspicion of anything and there was no evidence of a crime being committed or having been committed.

8.  No signs of distress were communicated to the officers to continue to justify or effectuate a welfare check and therefore the evidence does not support the continued search.

9.  Approximately half a mile away, according to Officer Munoz's testimony, a vehicle matching the description of the Whataburger vehicle was located and officers "caught up to it" after following it for an additional short distance, officers observed two traffic infractions and initiated a traffic stop.

10. Upon making contact with the driver, the first communication from Officer Munoz to the driver was that he was the same vehicle from the Whataburger call.

4

The trial court made the following conclusions of law:

> The Court finds that the Officer's testimony lacked credibility as to the reason for continued search and subsequent stop. The absence of further testimony establishing important time and distant frames from the call at the Whataburger to place of the subsequent traffic stop is concerning. Furthermore, there was no reason for the officers to continue a search for Defendant's vehicle when they had no reasonable suspicion of anything or any violation of law and there was no evidence presented which indicated any distress factors were present to justify a welfare check. Therefore, as presented, the evidentiary record does not support a welfare check. Based on the lack of supporting credible evidence and testimony, the Court finds that there was reasonable suspicion to justify the continued search of defendant's vehicle.[3] The reasons for the subsequent traffic stop are not considered by the Court.

The State timely appealed.

## II. ISSUES ON APPEAL

The State argues that (1) the trial court incorrectly applied the law of search and seizure when it granted the motion because it concluded the stop was pretextual; and (2) the trial court's finding that Zubiate committed traffic violations, confirmed by the arresting officer's dash cam video provide reasonable suspicion to justify the traffic stop. We address each argument in turn.

## III. ERROR IN SUBJECTIVE FOURTH AMENDMENT ANALYSIS

The State maintains that the trial court did not correctly apply the law to the facts when it granted the motion to suppress based on a conclusion that the stop was pretextual, because the constitutional reasonableness of a traffic stop does not depend on the actual motivation of the officers involved. The State maintains that search and seizure law recognizes that an objectively valid traffic stop is not unlawful even if law enforcement has an ulterior motive for effectuating a stop. We agree.

---

[3] Because the trial court granted the motion to suppress, we presume that the trial court intended for this sentence to read: "Based on the lack of supporting credible evidence and testimony, the [c]ourt finds that there was [not] reasonable suspicion to justify the continued search of Defendant's vehicle."

5

## A. Standard of Review

Appellate courts review a trial court's ruling on a motion to suppress under a bifurcated standard. *See State v. Arellano*, 600 S.W.3d 53, 57 (Tex.Crim.App. 2020). A trial court's findings of historical fact are afforded almost total deference if they are reasonably supported by the record. *See id.*, *citing Sims v. State*, 569 S.W.3d 634, 640 (Tex.Crim.App. 2019). The same deferential standard of review is applied to a trial court's determination of fact that is based upon a video recording admitted at the suppression hearing. *See State v. Duran*, 396 S.W.3d 563, 570 (Tex.Crim.App. 2013). A reviewing court must also defer to the trial court's factual findings concerning whether a witness actually saw what was depicted on a video. *See id.* at 571. A trial court's application of the law of search and seizure is reviewed de novo. *See id.* at 570.

## B. Reasonable Suspicion

A traffic stop for a suspected violation of the law constitutes a "seizure" of the occupants of the vehicle within the meaning of the Fourth Amendment. *See Whren v. United States*, 517 U.S. 806, 809-810 (1996). To justify a traffic stop, law enforcement needs reasonable suspicion. *See Kansas v. Glover*, 140 S.Ct. 1183, 1187 (2020); *Jaganathan v. State*, 479 S.W.3d 244, 247 (Tex.Crim.App. 2015). "Reasonable suspicion exists if the officer has 'specific articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably suspect that a particular person has engaged or is (or soon will be) engaged in criminal activity.'" *Jaganathan*, 479 S.W.3d at 247 (noting that the issue of the case was not whether the driver was guilty of violating a traffic offense, but whether the trooper had a reasonable suspicion to believe that she was).

A reasonable suspicion is more than a mere hunch; however, the standard requires considerably less proof of wrongdoing than a preponderance of the evidence, and obviously less

than is necessary for probable cause. *See Glover*, 140 S.Ct. at 1187 (noting that reasonable suspicion falls considerably short of 51% accuracy), *citing Navarette v. California*, 572 U.S. 393, 397 (2014). The standard "accepts the risk that officers may stop innocent people." *Jaganathan*, 479 S.W.3d at 247, *citing Illinois v. Wardlow*, 528 U.S. 119, 120 (2000). As a less demanding standard, reasonable suspicion can be established with information that is different in quantity or content than what is required to establish probable cause. *See Glover*, 140 S.Ct. at 1187, *citing Alabama v. White*, 496 U.S. 325, 330 (1990).

## C. Objective Fourth Amendment Analysis

A Fourth Amendment challenge to a traffic stop may not be based upon the actual motivations of an individual officer. *See Whren*, 517 U.S. at 813; *Walter v. State*, 28 S.W.3d 538, 542 (Tex.Crim.App. 2000). The fact that an officer has another subjective motive for seizing a motorist does not render an objectively reasonable seizure unlawful under the federal or Texas constitutions. *See State v. Gray*, 158 S.W.3d 465, 469 (Tex.Crim.App. 2005) (en banc), *citing Whren*, 517 U.S. at 806. As Justice Scalia wrote in *Whren* after reviewing the Court's prior decisions:

> We think these cases foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved. We of course agree with petitioners that the Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment. Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.

517 U.S. at 813. Moreover, because the Fourth Amendment prohibits only "unreasonable searches and seizures," an officer's objectively reasonable mistake of fact or law is tolerated. *See Heien v. North Carolina*, 574 U.S. 54, 57, 67 (2014) (noting that the court does not consider the subjective understanding of the officer).

7

**D. Application**

As an initial matter, in its findings and conclusions, the trial court incorrectly determined the point at which Appellant's Fourth Amendment rights became implicated.[4] During the time when Officer Munoz was "searching" for Zubiate's vehicle, Officer Munoz was driving on a public roadway with no emergency lights or siren activated. This action did not constitute a seizure of Zubiate within the meaning of the Fourth Amendment and did not require reasonable suspicion. *See Glover*, 140 S.Ct. at 1187. Rather, Zubiate was not seized within the meaning of the Fourth Amendment until law enforcement initiated a traffic stop. *See United States v. Cortez*, 449 U.S. 411, 419 (1981). Consequently, Officer Munoz was not required to support his actions with reasonable suspicion until the time he activated his emergency lights. *See Glover*, 140 S.Ct. at 1187; *Hamal v. State*, 390 S.W.3d 302, 306 (Tex.Crim.App. 2012). Thus, the trial court applied an incorrect legal standard when it found that law enforcement lacked reasonable suspicion to "search" for Zubiate.

The trial court also applied an incorrect legal standard by considering law enforcement's subjective motivation for initiating the traffic stop. *See Whren*, 517 U.S. at 813; *Gray*, 158 S.W.3d at 469. The trial court found that law enforcement observed Zubiate's vehicle commit "two traffic infractions" and initiated a "traffic stop," which is sufficient to uphold the stop under the Fourth Amendment. *See Heien*, 574 U.S. at 60. The trial court, however, did not consider the "reasons for the [] traffic stop" when it declared the stop unconstitutional. The court instead tied the stop

---

[4] The trial court found that law enforcement had "no reason . . . to search for the vehicle when they had no reasonable suspicion of anything and there was no evidence of a crime being committed or having been committed." The trial court repeated in its conclusions that "there was no reason for the officers to continue a search for Defendant's vehicle when they had no reasonable suspicion of anything or any violation of law . . . the Court finds that there was [not] reasonable suspicion to justify the continued search of Defendant's vehicle."

to the 911 call, determining that Officer Munoz's "testimony lacked credibility as to the reason for [the] continued search" and stop.

As to the pretextual reason for the stop, the trial court focused on the 911 call and whether Officer Munoz was truly making a welfare check. We need not resolve either of those matters. [5] [6] It is enough to note that the United States Supreme Court is resolute that the ulterior motives of the officer will not dictate the Fourth Amendment analysis. In *Arkansas v. Sullivan*, the Supreme Court reversed a judgment of the Arkansas Supreme Court that declined to follow *Whren*. *See Arkansas v. Sullivan*, 532 U.S. 769, 771-72 (2001) (per curiam). When the State appealed the trial court's grant of a suppression motion, the Arkansas Supreme Court rejected the same argument that the State raises in this appeal--that *Whren* makes "the ulterior motives of police officers . . . irrelevant so long as there is probable cause for the traffic stop . . .." *See id.* at 770. The Arkansas Supreme Court reiterated the trial court's conclusion that the arrest for speeding and improper window tinting was pretextual. *See id.* The Arkansas Supreme Court further indicated that, even if *Whren* precluded inquiry into an arresting officer's subjective motivation, nothing prevented the

---

[5] That being said, Officer Munoz testified at eight points during the suppression hearing that he initiated the traffic stop because Zubiate committed traffic violations. Officer Munoz did not testify that he initiated the traffic stop because he was conducting a welfare check. *Cf. Madden v. State*, 242 S.W.3d 504, 513 (Tex.Crim.App. 2007) (indicating that affirmative evidence must put the existence of a fact into question to warrant a Texas Code of Criminal Procedure article 38.23(a) jury instruction).

[6] That being said, in *Navarette v. California*, the Supreme Court held that an anonymous 911 call bore adequate indicia of reliability to provide law enforcement with reasonable suspicion that a motorist was driving drunk. *See Navarette v. California*, 572 U.S. 393, 403-04 (2014). A dispatch team received a call from a neighboring county dispatch relaying that a truck model and license plate ran a party off a road at a highway mile marker five minutes prior. *See id.* at 395. Thirteen minutes later, a responding officer initiated a traffic stop based upon reasonable suspicion of drunk driving when he encountered the truck 19 miles down the road. *See id.* The Supreme Court determined that the anonymous 911 caller had eyewitness knowledge of the situation and was likely telling the truth, given that the officer encountered the truck close in time and distance to the location reported. *Id.* at 398-99. Because a 911 caller can be identified, traced, and prosecuted for creating a false report, an officer can conclude that "a false tipster would think twice" before using the 911 system. *Id.* at 401. The Court also noted that behaviors such as crossing the center line of a highway, driving all over the road, and weaving back and forth, are "sound indicia of drunk driving." *Id.* (indicating that the behaviors listed in the Nat. Highway Traffic Safety Admin., The Visual Detection of DWI Motorists, 4-5 (Mar. 2010), such as problems maintaining lane position, are correlated with drunk driving).

state court from interpreting the federal constitution more broadly than the Supreme Court, to provide more rights. *See id.*

In reversing the state court decision, the Supreme Court held that the Arkansas Supreme Court's conclusion was "flatly contrary to" controlling precedent. *Id.* at 771. The arresting officer's motivation for making an otherwise valid stop could not provide the basis for a Fourth Amendment challenge. *See id. Whren* held that "[s]ubjective intentions play no role in ordinary, probable cause Fourth Amendment analysis." *Id.* at 772, *quoting Whren*, 517 U.S. at 813. As in *Sullivan*, the trial court applied a standard that was contrary to federal law by considering Officer Munoz's subjective reason for the continued search and subsequent stop. *See Sullivan*, 532 U.S. at 771. We thus sustain the State's first issue.

## IV. THE TRAFFIC STOP WAS OBJECTIVELY VALID

The State argues that the trial court's findings that Zubiate committed traffic violations, based upon Officer Munoz's uncontradicted testimony, supported an objective justification for the traffic stop. We agree.

The trial court found that Officer Munoz encountered Zubiate's vehicle less than a mile from the Whataburger, followed the vehicle for a "short distance, . . . observed two traffic infractions and initiated a traffic stop."[7] No one disputes that the dash-cam video depicts Zubiate committing four traffic violations. *Cf. Madden v. State*, 242 S.W.3d 504, 513 (Tex.Crim.App. 2007); *Hamal*, 390 S.W.3d at 307 (concluding that when there was dispute in the testimony about what a video depicted, there was no fact issue warranting a Texas Code of Criminal Procedure article 38.23 jury instruction). Defense counsel did not cross-examine Officer Munoz regarding

---

[7] The trial court twice characterized Officer Munoz's encounter with Zubiate as a "traffic stop" in the conclusions of law, referencing its finding that Officer Munoz pulled Zubiate over after Zubiate committed traffic violations.

the traffic violations, nor did counsel argue that Zubiate did not violate Texas traffic laws. *Cf. Madden*, 242 S.W.3d at 514, *citing* 40 George E. Dix & Robert O. Dawson, CRIMINAL PRACTICE AND PROCEDURE § 4.194 at 282 (2d ed.2001) (noting that a disputed fact issue is not created by the possibility that the jury may disbelieve a portion of the State's evidence).

Because Texas law prohibits driving across the double yellow line of a highway and driving on the wrong side of the road, Officer Munoz's testimony provided reasonable suspicion to initiate a traffic stop. *See Leming v. State*, 493 S.W.3d 552, 559 (Tex.Crim.App. 2016) (noting that proof of the actual moving violation is not required to support reasonable suspicion to initiate a traffic stop); TEX.TRANSP.CODE ANN. §§ 545.063, 545.051, 545.101.[8] We thus sustain the issue.

## V. THE DASH-CAM VIDEO SUPPORTS THE TRIAL COURT'S FINDINGS

In the event this Court would not defer to the trial court's finding that Officer Munoz "observed two traffic violations," the State alternatively proposes that Officer Munoz's dash-cam video provides indisputable visual evidence that Zubiate (1) crossed a double yellow lane divider on the roadway and (2) drove in the lane of oncoming traffic, and (3) failed to properly signal intent to change lanes. Appellate courts may review "indisputable visual evidence" contained within a video recording [which would not pivot on an evaluation of credibility and demeanor] de novo. *See Duran*, 396 S.W.3d at 570; *Carmouche v. State*, 10 S.W.3d 323, 332 (Tex.Crim.App. 2000). After viewing the dash-cam video and considering Officer Munoz's testimony that it depicted Zubiate committing traffic violations, the trial court did not explicitly find any conflicts

---

[8] Zubiate argues that the trial court impliedly found that Officer Munoz did not observe Zubiate commit traffic violations and that the traffic violations depicted on the dash cam video occurred after Officer Munoz activated his emergency equipment. We do not need to imply findings of the trial court because it made explicit findings that "officers observed two traffic infractions and initiated a traffic stop." In addition, the record does not contain evidence indicating that Zubiate did not commit traffic violations, *see supra*.

between the two pieces of evidence on this topic. We likewise conclude that Officer Munoz's dash-cam video supports the trial court finding that "officers observed [Zubiate commit] two traffic infractions and initiated a traffic stop."

**A. Video Synopsis**

The video begins at 23:42:28, with Officer Munoz traveling a distance behind Zubiate on a multi-lane road. Zubiate drives with his brakes activated on the flat roadway surface from 23:42:36 to 23:42:49. When Zubiate moves into the right turn only-lane, his vehicle straddles the solid white lane divider from at least 23:42:50 to 23:42:55. Zubiate does not timely signal his intention to move into the right turn-only lane, but activates his right turn signal after his vehicle straddles the white solid lane divider, at 23:42:50.

Zubiate comes to a four-way intersection, where his traffic signal is green. He makes a wide right turn at 23:42:57. Zubiate's vehicle crosses the double yellow center lane divider of the roadway, and lands in the left turn-only lane for oncoming traffic. Zubiate drove for several seconds in the lane of oncoming traffic by the time the camera captured his vehicle, at 23:43:02.

Officer Munoz did not have his emergency lights activated as he approached the four-way intersection, because emergency lights are not reflected in the road sign to the right of the patrol car as it approached the traffic signal at 23:42:57. The reflection in the road signs indicate that Officer Munoz activated his emergency lights immediately after Zubiate completed the right-hand turn and landed in the oncoming lane of traffic. At that time, 23:43:00, Officer Munoz was at the green traffic signal making the right-hand turn. For the stop to be valid, Officer Munoz must have had reasonable suspicion at this point.[9]

---

[9] The video depicts that, after Officer Munoz activated his emergency lights, Zubiate changed lanes without signaling, drove with his tires on or over the lane marker, and took more than a minute and 15 seconds to respond to the siren and patrol unit lights. Although Officer Munoz testified to this behavior during the suppression hearing, it is relevant

12

The video demonstrates that, at the time Officer Munoz activated his emergency lights, he had a specific and articulable basis to reasonably conclude that Zubiate committed traffic violations. *See Jaganathan*, 479 S.W.3d at 247. Specifically Officer Munoz had reasonable suspicion to believe that Zubiate (1) straddled a solid white lane divider in the roadway, (2) did not signal prior to making a lane change, (3) made a wide right turn, (3) crossed a double yellow lane divider on a roadway, and (4) drove in an lane of oncoming traffic. *See Leming*, 493 S.W.3d at 561 (indicating that reasonable suspicion does not require "proof of the actual commission of the offense"); TEX.TRANSP.CODE ANN. §§ 545.051, 545.060(a), 545.063, 545.101, 545.104(a). As such, the trial court's finding that "officers observed two traffic infractions" is valid under either a deferential or de novo standard of review. *See Duran*, 396 S.W.3d at 570.

## B. This Court May Review the Video

Zubiate responds with several arguments concerning the dash-cam video. He first maintains that the recording was inadmissible pursuant to Texas Rules of Evidence 104(b), because the State did not lay a proper foundation to authenticate the DVD. But as trial counsel acknowledged during the proceeding, the rules of evidence do not apply at suppression hearings. *See Granados v. State*, 85 S.W.3d 217, 227 (Tex.Crim.App. 2002), *citing McVickers v. State*, 874 S.W.2d 662, 663 (Tex.Crim.App. 1993) (en banc). Zubiate next asserts that the video is not a part of the appellate record. The reporter's record includes the dash-cam video as an exhibit for the hearing, and the trial court permitted the State to play the video as Officer Munoz explained key portions of it. This Court may thus consider the video on appellate review. *See Amador v. State*, 221 S.W.3d 666, 674 (Tex.Crim.App. 2007) (indicating that evidence made part of the trial record and treated as if formally introduced is properly considered at trial and properly included in the

only towards a consideration of probable cause for Zubiate's arrest and not relevant towards reasonable suspicion for the traffic stop.

13

appellate record and considered on appellate review), *citing Harden v. State*, 417 S.W.2d 170, 174 (Tex.Crim.App. 1967) (op. on reh'g) (recognizing that, in the absence of a timely objection, displaying a photograph and eliciting testimony concerning it was tantamount to the introduction of the evidence).

Finally, Zubiate argues that the State played only inculpatory portions of the dash-cam video for the trial court and not the exculpatory portions of the recording. We need not address the issue, because trial counsel did not object while the State played the video, request to play additional portions of the recording, or dispute that Zubiate committed traffic violations. *See Lane v. State*, 151 S.W.3d 188, 192-93 (Tex.Crim.App. 2004) (indicating that, to preserve error in admitting evidence, a party must raise a proper objection, obtain a ruling on the objection, and object each time the evidence is offered or obtain a running objection); *Buchanan v. State*, 207 S.W.3d 772, 775 (Tex.Crim.App. 2006) (noting that to preserve an issue for appeal, a timely objection must be made in the trial court).

## VI. CONCLUSION

Having sustained the State's issues, we reverse the trial court's order granting Zubiate's motion to suppress and remand the cause to the trial court for further proceedings consistent with this opinion.

JEFF ALLEY, Chief Justice

August 31, 2020

Before Alley, C.J., Rodriguez, and Palafox, JJ.

(Do Not Publish)

14