Filed 2/16/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B305359 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA477784) |
| v. | |
| MARLON FLORES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mildred Escobedo, Judge. Affirmed.

Richard L. Fitzer, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Zee Rodriguez, Supervising Deputy Attorney General, and Michael C. Keller, Deputy Attorney General, for Plaintiff and Respondent.

—————————————

A police officer is allowed to question people on the street, who themselves are free both to refuse to answer the officer and to refuse even to listen to the officer.  People are fully at liberty merely to go on their way.  (*Florida v. Royer* (1983) 460 U.S. 491, 497–498 (plur. opn. of White, J.).)

These are core American freedoms.  Refusal to cooperate with police, without more, does not create an objective justification for an investigative detention.  (*Florida v. Bostick* (1991) 501 U.S. 429, 437.)

But some reactions to police can be telltale.  These reactions may suggest consciousness of guilt and may entitle police to investigate further.  Under the rule of *Terry v. Ohio* (1968) 392 U.S. 1, police patrolling a high crime area reasonably become suspicious when a person sees them and runs.  This reasonable suspicion justifies detaining the runner for investigation:  a *Terry* stop.  (*Illinois v. Wardlow* (2000) 528 U.S. 119, 124–125 (*Wardlow*).)  Nervous and evasive behavior is a pertinent factor in determining whether suspicion is reasonable.  (*Id.* at p. 124.)

"Headlong flight—wherever it occurs—is the consummate act of evasion:  It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."  (*Wardlow*, *supra*, 528 U.S. at p. 124; see also *Kansas v. Glover* (2020) __ U.S. __, __ [140 S.Ct. 1183, 1188–1189] (*Glover*) [reaffirming *Wardlow*].)

Judicial determinations of reasonable suspicion "must be based on commonsense judgments and inferences about human behavior."  (*Wardlow*, *supra*, 528 U.S. at p. 125.)  There are innocent explanations for avoiding police, so flight does not *necessarily* indicate ongoing criminal activity.  But unprovoked flight upon noticing the police entering a high crime area gives an

2

officer a reasonable basis to detain the runner to investigate further.  (*Id.* at pp. 121–125.)  The Fourth Amendment allows the officer "to resolve the ambiguity."  (*Id.* at p. 125.)

This federal approach governs us.  We are not permitted some state law departure.  (*People v. Souza* (1994) 9 Cal.4th 224, 232–233.)

We affirm the trial court's denial of a motion to suppress evidence.

## I

## A

The police here were patrolling a high crime area.  They knew this particular street.  They patrolled it daily because it was a narcotics hangout.  One officer on this two-man team had made a drug arrest in that cul-de-sac the night before.  They also knew this cul-de-sac to be a gang haunt; taggers daily sprayed gang graffiti there.

About 10:00 p.m., the two officers drove into this cul-de-sac. At the preliminary hearing, Officer Michael Marino testified Marlon Flores was standing in the street behind a car that was parked on the red curb at the dead end.  "After we initially saw him, he went over to the passenger side rear fender area, appeared to be ducking down as if trying to hide or conceal something from us."

The officers believed Flores "was attempting to conceal himself from the police."  An officer got out of the police car and approached the crouching Flores, who continued to crouch for some 20 seconds as the officer walked toward him with the flashlight.  The police believed Flores was pretending to tie his shoe.

The police thought Flores's actions were suspicious. They ordered him to stand and put his hands on his head. They handcuffed Flores out of concern for their safety. One officer checked Flores for weapons. This officer patted an electronic car key on Flores that activated the lights on the parked car. The other officer looked through the car window and saw a methamphetamine bong. The officer suspected the car might contain other contraband.

The police asked Flores if this was his car; Flores said yes. They asked for identification. Flores directed the police to his wallet, which was inside the car in the driver's side door. Flores gave his consent for the police to get his wallet. In the wallet police found a bindle of what looked like methamphetamine. Police then searched Flores's car and found a loaded and unlicensed gun inside a backpack on the front passenger seat.

B

The trial court denied Flores's motion to suppress the gun evidence. This hearing was brief: just one witness.

Judge Escobedo asked the prosecutor, Juan Mejia, to call his first witness. Mejia summoned Officer Daniel Guy to the stand. Guy testified he and his partner Marino saw Flores on the day in question.

*Q BY MR. MEJIA: And what, if anything, did you see the defendant doing?*

*A The defendant was standing in the roadway next to a silver Nissan. And as we approached closer, he ducked behind the rear passenger panel of the vehicle.*

*Q And did that cause you to do anything?*

*A Yes. We conducted a pedestrian stop.*

*. . . .*

4

*Q  And did—when you were approaching the defendant and that vehicle, did he look in your direction?*

*A  Yes.*

*Q  And what, if anything, did the defendant do when he looked in your direction?*

*A  He proceeded to the passenger side of the vehicle and began to crouch.*

*Q  Did that cause any suspicion?*

*A  Yes.*

*MS. PRESCOP:  Objection.  Leading.*

*THE COURT:  Overruled.*

*Q  BY MR. MEJIA:  And based on that suspicion—or what was the suspicion that caused you to believe?*

*A  Based on the suspicion this is a known narcotics [area].  I myself have made an arrest just prior, the night prior for narcotics.  So my suspicion believed that he was there loitering for the use or sales of narcotics.*

*Q  And him getting—crouching down like that, that caused you to believe that there was some crime occurring perhaps?*

*A  That he was attempting to conceal himself from the police.*

Flores's attorney, Julianne Prescop, cross-examined Guy.

*Q  And when you said that when he saw you, he ducked towards the passenger side of the car; is that correct?*

*A  That's correct.*

*Q  And at that point he was at the curb area; is that correct?*

*A  Yes.*

*Q  Okay.  And when he ducked to that side he was there for approximately a minute before you pulled over or before you—*

*A  It was probably less than a minute.*

5

. . . .

*Q  Okay.  He was—when you approached him he was leaning down tying his shoes?*

*A  I believe he pretended to tie his shoe.*

At this point, the defense showed a video from a police body-worn camera.  Prescop noted there was no audio for the first part of the video.  The transcript notes the video was played in open court but was not reported by the court reporter.  This portion of the hearing is not transcribed.  Prescop continued her cross-examination and asked about the video images that people at the hearing had just been watching.

*Q  So [that video is] a fair and accurate depiction of what you saw before you approached him that day; is that correct,?*

*A  No.  The body worn camera only faces a certain direction. My head can go in another direction.*

We describe the contents of this video, which is in the record.

The video is two minutes and four seconds long.  It begins with a view from the interior of what seems to be a marked police car.  A slice of the outside world is visible through the windshield and the right passenger window.  The camera is pointed upward at an angle.  At that angle, the roadway and people at street level are out of the frame at the outset.  Rather the beginning shows only sky, rooftops, upper portions of buildings, and tree tops.  The sky is dark.  It is nighttime.

The first few seconds show the police car is moving forward and eventually stopping.  Flores is not within the camera's frame; we cannot see him at all.  The camera angle is not pointed in his direction.  As the car rolls forward, the camera view continues to change, as though the camera were mounted on a dolly.  At the

6

seven second mark, the car stops and the video view becomes static. Flores still is not within the camera's view.

At about the 12 second mark, you can see some sort of motion in a dark area in the extreme lower left corner of the wide-angle view. At about the 15 second mark, Flores's head rises into view. Flores stands and seems to be making some sort of motion with one arm, as though he is working it in a circle to stretch or loosen his shoulder or back muscles.

At the 37 second mark, Flores crouches down and his head drops out of view.

At the 41 second mark, Flores raises his head again.

At the 45 second mark, again Flores drops from view and remains out of the camera's picture.

At about the 50 second mark, the body camera shows an officer wearing the camera opening his front passenger door and getting out of the police car. At 53 seconds this camera moves forward. We see the officer must be walking towards Flores. The officer's flashlight is illuminating the way, but Flores remains out of view behind the car.

At 54 seconds, the officer wearing the camera continues to walk forward and then around the car. The officer's and camera's forward motion brings Flores into the camera's view.

At 55 seconds, we see Flores crouched, facing away from the camera with both hands near his right shoe. His back is to the camera: his body conceals his hands and his right shoe from the approaching officer and the camera. The upper right corner of the picture shows the officer's flashlight pointing at Flores.

Flores does not raise his head or turn toward the source of the approaching light, which is very bright and now has suddenly and sharply cast Flores's shadow in front of him. Flores does not

7

raise his hands above his head or make any visible response to the sudden illumination. Rather he remains in a crouch and continues to move his elbows and arms as though he is toying with his feet, but we still cannot see his hands or his right foot.

At 57 seconds, the audio comes on and the officer continues to walk towards Flores with the bright light shining on Flores. The chatter from the officer's walkie-talkie is noisy. Flores is silent: he does not respond to this approaching noise and light. Flores continues to crouch and to toy with his right foot, which remains out of the camera's view.

At one minute and one second, the officer and his camera stop their forward motion. Flores remains crouched in the same position, facing away from the camera and the officer, hands still concealed.

At about one minute and three seconds, an officer asks Flores to stand up.

Flores remains in this crouched position, ignoring the officer and continuing to toy with the area around his foot.

An officer again asks Flores to stand up at the one minute and 12 second mark.

Flores remains in his crouch.

At one minute and 14 seconds, the officer says "Hey, hurry up." Now Flores begins to stand.

At one minute and 16 seconds, the officer tells Flores, "your hands behind your head," and Flores complies. The police handcuff Flores and have him stand near a fence.

In sum, at 10:00 p.m. at night, on a cul-de-sac known for its illegal drug and gang activity, police see a man in the street who, when he sees them, goes around and ducks behind a car. The man looks up, ducks behind the car again, looks up again, and

then ducks down again.  When an officer approaches to see what is going on, the man remains crouched, with his hands out of sight and with his moving arms away from the approaching officer and his bright flashlight, which casts an obvious beam on the man.  The beam contrasts sharply with the dark street and sidewalk and casts the man's shadow in front of him, in the man's line of sight.  The approaching officer's radio is noisy.  Despite the approaching light and noise, the man continues to face away from it, to move his arms, and to keep his hands out of the officer's view.  He stays ducked down for about 20 seconds.  The officer testifies he suspects the man is "there loitering for the use or sales of narcotics."  Officers find the man has methamphetamine, a methamphetamine bong, and a loaded gun.

## C

At the hearing, Judge Escobedo invited argument on Flores's suppression motion.

Defense attorney Prescop argued the detention was illegal from the start and the drugs and the gun were the fruit of the poisonous tree.  Judge Escobedo asked, "So your argument is essentially that the fact that he was standing by a car and ducked down is not enough?"  Prescop agreed:  that was her argument.

Prosecutor Mejia argued the encounter was a classic *Terry* stop.  Mejia recounted the video.  He noted Flores "continued to stay down in a bent position, which was very unusual.  Usually when a citizen is approached by a police officer you would stand up and pay attention or—but he continued in that crouched position even as the officers were approaching him from two different sides."

Judge Escobedo remarked what the video showed was "odd."

Mejia continued:  Flores "crouched down as if to hide from them as to get out of the police presence.  That's the reasonable suspicion."

Mejia said the video showed the officers see Flores "do a furtive gesture and then [he] continued to do that.  It's not like, you know, you do go down and tie your shoe.  You have to bend down.  But he looked like he was, according to the testimony, was first hiding.  And then you see it on the video.  He stays down in that position in a very, very odd suspicious manner."

Judge Escobedo said, "The question here for the Court truly is whether there [were] specific articulable facts that appear to be enough ground for suspicion.  And really the bottom line is the Court to determine does it sound like they're just coming up with something to give them reason to go and disrupt this citizen's activity or was there true reasonable suspicion."

"The Court is struggling with this in this way.  Had the defendant been standing there and the car approaches and the defendant continued to just stand there and the officers approached, I don't think there would have been sufficient articulable facts.  [¶]  What happens in this scenario is defendant does, as in these other cases, try to avoid contact because he sees the police officers and he ducks.  The defendant argues he's tying his shoe.  Let's just assume I accept that for a second, and he's tying his shoe.  [¶]  Well, the minute the police officers stop and shine the light on him, any normal human being would stand up and say, 'Oh, you scared me' or 'Oh, what can I help you with?' Or 'Oh, why are you coming towards me?'  [¶]  But the video clearly shows he ducks down.  He pretends to be tying his shoe or

10

is tying his shoe. And as Mr. Mejia points out, and it struck the Court as well in viewing the video, he doesn't stand up. He's still crouched down toying with his feet. And the officers are walking towards him with a huge light on him. Because you can see that his pants are below his waist. His underwear is showing. He's still ducked down, not moving, nothing is being said. The officers say something as they're approaching, and the person is still hunched over. [¶] That's odd. That's odd behavior. That's not normal. That's suspicious. [¶] So when the officers approached and they say, 'Hey, stand up,' even then he's not standing up. That's sufficient for the Court to find that there's specific articulable facts. [¶] And that's what I was struggling with. Had he just gotten up even if he was tying his shoe while they're approaching him. But that didn't occur. It was far too long a period of time. And he didn't even get up until the officer said, 'Hey, stand up.' That was odd, and I think that that's suspect. [¶] And I think the ducking and remaining hunched over is more than enough for this Court to find that there were articulable facts to find suspicion and enough for the officers to detain him, enough for the officers to thereafter question about identification."

After Judge Escobedo denied his suppression motion, Flores pleaded no contest to carrying a loaded, unregistered handgun in violation of Penal Code section 25850, subdivision (a). The court suspended imposition of the sentence, placed Flores on formal probation for three years with conditions including a drug program and 45 days of CalTrans work, and gave him credit for 10 days served.

## II

Flores challenges the legality of this street encounter.

11

In reviewing an order on a motion to suppress, we defer to the trial court's factual findings, express or implied, if substantial evidence supports them.  We exercise independent judgment in determining whether, on those facts, the police action was reasonable under the Fourth Amendment.  (*People v. Silveria* (2020) 10 Cal.5th 195, 232 (*Silveria*).)  We view the evidence in the light most favorable to the order denying suppression, as the familiar rule governing appellate review requires.  (*People v. Ellis* (1993) 14 Cal.App.4th 1198, 1200.)  We must draw all presumptions in favor of the trial court's ruling.  Where there are no express findings of fact, we imply whatever findings are necessary to support the order.  We must uphold express and implied findings if substantial evidence supports them.  (*People v. Fulkman* (1991) 235 Cal.App.3d 555, 560.)

The Fourth Amendment permits police to initiate a brief investigative stop when they have a particularized and objective basis for suspecting the person of criminal activity.  A mere hunch is too little.  This standard requires considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than what is necessary for a finding of probable cause.  The standard depends on the practical considerations of everyday life on which reasonable and prudent people act.  Courts must permit officers to make commonsense judgments and inferences about human behavior.  (*Silveria*, *supra*, 10 Cal.5th at p. 236.)

Citing *People v. Kidd* (2019) 36 Cal.App.5th 12, 21–22, Flores contends the *Terry* stop began when the police shined a flashlight on him.  With our italics, the *Kidd* decision stated that, "[w]ithout more, a law enforcement officer shining a spotlight on a person does *not* constitute a detention."  (*Id.* at p. 21; cf. *Terry v.*

*Ohio* (1968) 392 U.S. 1, 16 ["whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person"].)

The *Terry* stop began when the officer told Flores to stand and put his hands behind his head.

The trial court ruled that, at that point, Flores's suspicious actions meant a *Terry* stop was proper.

The trial court's ruling was sound.

Judge Escobedo expressly found three facts. First, Flores saw police and tried to avoid contact with them by ducking down behind a parked car.

Second, during Flores's ducking and crouching, Flores was "toying with his feet." Flores did not freeze or remain still. Rather than remain motionless, Flores continued doing something with his hands. He persisted despite the approaching light and radio noise, which obviously were from an officer from the police car Flores had seen before ducking. Flores kept moving his hands. Flores kept his hands out of the sight of the approaching officer with the camera.

Third, as police that night approached in an obvious way "with a huge light on him," Flores persisted in his odd crouch position for "far too long a period of time."

Judge Escobedo concluded Flores's conduct was "more than enough for this Court to find that there were articulable facts to find suspicion and enough for the officers to detain him, enough for the officers to thereafter question about identification."

The combination of these facts did not establish Flores was engaged in illegal drug activity, but the trial court was right that together the facts justified this *Terry* stop.

Flores asks, how do you know if a person is pretending to tie his shoe?  The answer is you would have valid suspicions if the person picked an unlikely moment for the task—in the dark, just after seeing police, and just after ducking once already—and if the person took an unusually long time at it.   The trial court found Flores kept crouching for a suspiciously long time.  Common sense takes context into account.

Certainly there are innocent possibilities.  But, in combination with the other factors, a reasonable officer had a reasonable basis for investigating further to resolve this ambiguity, because nervous and evasive behavior is a pertinent factor in determining whether suspicion is reasonable.  (*Wardlow*, *supra*, 528 U.S. at p. 124.)  Courts must permit police to make commonsense judgments and inferences about human behavior.  (*Glover*, *supra*, __ U.S. at p. __ [140 S.Ct. at p. 1188].)

## DISPOSITION

The judgment is affirmed.

WILEY, J.

I concur:

GRIMES, Acting P. J.

14

**STRATTON, J., Dissenting.**

I dissent. After dark, in a high crime neighborhood, a Hispanic man in a tank top ducked halfway behind his car after he saw police, and then failed to rise immediately "like a normal human being" and express his surprise at being approached and put under a spotlight. Instead, he froze and straightened up only when told to do so by the police. On these facts alone, he and his vehicle were searched. That was unlawful because the officers had no reasonable suspicion that a criminal act was afoot.[1]

The majority concludes that ducking, freezing, and not rising fast enough under these circumstances gave those officers reasonable suspicion to conduct a *Terry* stop. I cannot abide this holding as it threatens to allow police detention based on commonplace conduct subject to interpretation. The majority's overbroad view of what sort of conduct can be deemed suggestive of wrongdoing ignores applicable law and the realities of twenty-first century America. In the case of a person wary of police interaction, the majority's approach leaves virtually no room for that person's conduct to be deemed "normal" and hence not suspicious.

First, let's review the evidence. When the police notice appellant, he is standing next to the driver's side of a parked car. The body cam video is very clear that the suspicious activity described by the police was appellant moving from a standing position in the street outside the driver's side of his car to a bending position between the sidewalk and the curb outside the

---

[1]    It goes without saying that everything discovered after this unlawful detention should have been suppressed as the fruit of the poisonous tree. (*Wong Sun v. United States* (1963) 371 U.S. 471.)

1

rear passenger side of the car. The two police officers approach in a marked car. They believe appellant moved out of the street to hide in reaction to their presence. The two officers drive up and stop behind appellant's car. When the officers shine their spotlight on appellant, he is bent over at the waist with his derriere high in the air (like a diver doing a jack knife). His arms are stretched down to the ground and his hands are near his feet. The video shows appellant is not completely "hidden" behind the side of the car; instead, his body protrudes past the back end of the car. Thus, his body is plainly visible from both behind the car and next to it. According to the testifying officer, he was "pretending to tie his shoe."[2]

The trial court described the incident accurately and then made its findings. It did not adopt the officer's testimony that appellant appeared to be hiding. Nor did it find appellant was not tying his shoe, although at one point the trial court remarked he appeared to be "toying" with it. (While the majority deems "toying" part of the articulable facts in support of reasonable suspicion, the trial court did not. The officer testified he saw plainly what appellant was doing with his hands.) The trial court found appellant was "try[ing] to avoid police contact because he sees the police officers and he ducks." The court implied that this action was not that suspicious, saying, "Had he just gotten up even if he was tying his shoe while they're approaching him." What mattered to the trial court was that appellant froze in that jackknife position when the officers shined their light on him, and he remained motionless and silent until commanded to stand:

---

[2]    As an aside, how do you know if someone is "pretending" to tie his shoe?

2

"He's still ducked down, not moving, nothing is being said.  The officers say something as they're approaching, and the person is still hunched over.  [¶]  That's odd. That's odd behavior. That's not normal.  That's suspicious."  According to the trial court, "any normal human being would stand up and say, 'Oh, you scared me' or 'Oh, what can I help you with?' Or 'Oh, why are you coming towards me?' " when the police approached, shining their light on him.  The fact that Flores did not move until the officers told him to "was odd, and I think that that's suspect," said the trial court.  The trial court concluded, "It was far too long a period of time.  And he didn't even get up until the officers said, 'Hey, stand up.'  That was odd, and I think that that's suspect."

The trial court apparently found the detention occurred after appellant delayed too long in rising to his full height.  The majority agrees with the trial court.  I don't.

When did the detention occur?  The test to determine whether an individual has been detained is "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (*United States v. Mendenhall* (1980) 446 U.S. 544, 554.) The required show of authority is measured by an objective test.  (*Ibid.*)  The evidence we consider is limited to that presented at the suppression hearing.  (*People v. Zamudio* (2008) 43 Cal.4th 327, 342.)

Two cases appear to be right on point factually.  In *People v. Garry* (2007) 156 Cal.App.4th 1100, a detention occurred because the officer shined his spotlight on the defendant, exited his patrol vehicle, walked briskly towards the defendant, and immediately asked about his parole or probation status.  (*Id.* at pp. 1111–1112.)  In *People v. Roth* (1990) 219 Cal.App.3d 211, a

3

detention occurred because a deputy shined his spotlight on the defendant, two deputies exited the patrol car, and one commanded the defendant to approach. (*Id.* at p. 215.)

The circumstances here show that the interaction between the officers and appellant ripened into a detention when the officers positioned their marked patrol car a little askew to and behind appellant's car, shined a "huge" spotlight on him, and converged on him, one approaching him from behind (where the patrol car is parked) and the other approaching him on the sidewalk from the other side, having walked around the front of the car in the meantime. The car and an iron spiked fence blocked the other directions. Appellant had no "escape route" even if he wanted to walk away. At this point appellant was detained.

Under these circumstances, a reasonable person, surrounded and under a spotlight, would not feel free to leave. This is especially so because all motorists are trained to acquiesce immediately when police officers pull up behind them and turn on their lights. Thus, I disagree with the holding of the trial court and the majority that the detention occurred only later-- after appellant froze for too long.

At the point when appellant was detained under the spotlight, all the officers knew was that he was standing next to a car in a high crime neighborhood and had moved out of the street to the other side of the car and bent over when they believed he had seen their patrol car. These are not articulable facts supporting reasonable suspicion. The trial court apparently agreed as it started the detention clock at the point when appellant delayed in standing up.

4

This brings me to the second issue with which I disagree with the majority--the issue of reasonable suspicion. Let's assume the detention occurred at the point when appellant did not immediately stand erect of his own accord. The testifying officer could not articulate what criminal activity he suspected appellant was engaged in. He just thought it was suspicious when appellant moved from one side of the car to another and then bent over. The court found it "odd" and therefore suspicious that appellant did not move or speak when the spotlight came on and did not rise until the officers commanded him to do so. To the trial court, reasonable suspicion was created because appellant bent over *and*, unlike "any normal human being," waited "too long" (an amorphous concept not quantified by the witness or the court) to stand erect and remained silent.

I accept the trial court's finding that appellant was trying to avoid police contact by ducking. But, as we know, appellant had an absolute right to avoid police contact. In *Florida v. Royer* (1983) 460 U.S. 491, the Supreme Court reiterated that a person can avoid police contact without arousing reasonable suspicion by walking away, refusing to listen to, or declining to participate in police questioning. A person may go about one's business. (*Id.* at pp. 497-498.) Under the trial court's ruling and the majority opinion, however, how does one avoid police contact without creating reasonable suspicion justifying detention?

Courts have already decided that being alone at night in a high crime neighborhood does not amount to reasonable suspicion. Moreover, the facts upon which reasonable suspicion can be based must be articulable and objective. (*Brown v. Texas* (1979) 443 U.S. 47.) In other words, not subject to the subjective perspective of the persons doing the interpreting. The majority's

decision undercuts that rule and threatens to subject people to *Terry* stops for commonplace conduct. By way of analogy, the Court in *Illinois v. Wardlow* (2000) 528 U.S. 119 focused on "headlong" flight as a permissible articulable fact in determining reasonable suspicion. It chose "headlong" flight because "unprovoked flight is the exact opposite of going about one's business." (*Id*. at p. 121.) It created a standard that, by and large, avoids deeming commonplace conduct suspicious. For example, only in exceedingly rare cases could a person credibly confuse a daylight neighborhood jog with headlong flight from police.[3]

The majority's approach that appellant froze and waited "too long" to rise will apply to a wide array of conduct that cannot provide an objective basis for reasonable suspicion. Appellant's reaction was neither abnormal nor suspicious. Indeed, some even might instruct their children remaining still is a prudent course of action (and even then, it may not work. #BlackLivesMatter.) To hold otherwise ignores the deep-seated mistrust certain communities feel toward police and how that mistrust manifests in the behavior of people interacting with them.

Even outside of communities distrustful of police authority, how safe is it anytime or anywhere to move suddenly when police approach? Movement is incredibly dangerous for anyone because if police deem it sudden, and hence threatening, someone may end up shot. On top of that, we know for some populations, to stand up from a bent position as the police approach would effectively be suicidal, as it would likely be interpreted as a

---

[3]     I say credibly because recall the reasons given for shooting to death daylight jogger Ahmaud Marquez Arbery.

6

threatening act.  To find freezing and waiting "too long" reasonably suspicious is irresponsible and dangerous to both law enforcement and those with whom it interacts.

The majority says you can't duck and freeze and then wait too long to stand up.  What's left?  The only option for a "normal" human being, according to the majority, is to immediately stand erect and politely inquire about the purpose of the stop, a conversation we all have an absolute right not to start.  In effect, the majority compels those in a high crime area to "stand still" in a way the police subjectively believe is not furtive so as not to create reasonable suspicion that criminal activity is afoot. Without objective criteria pointing to a reasonable suspicion of criminal activity, "the risk of arbitrary and abusive police practices exceeds tolerable limits."  (*Brown v. Texas, supra*, 443 U.S. at p. 52.)  The majority opinion narrows the options for those who want to be judged "normal" and hence beyond suspicion.  They must stand erect and chat up the officers who approach them.  Tell that to Eric Garner.

STRATTON, J.