Justice THOMAS delivered the opinion of the Court.
*1186 This case presents the question whether a police officer violates the Fourth Amendment by initiating an investigative traffic stop after running a vehicle's license plate and learning that the registered owner has a revoked driver's license. We hold that when the officer lacks information negating an inference that the owner is the driver of the vehicle, the stop is reasonable.
I
Kansas charged respondent Charles Glover, Jr., with driving as a habitual violator after a traffic stop revealed that he was driving with a revoked license. See *1187 Kan. Stat. Ann. § 8-285(a)(3) (2001). Glover filed a motion to suppress all evidence seized during the stop, claiming that the officer lacked reasonable suspicion. Neither Glover nor the police officer testified at the suppression hearing. Instead, the parties stipulated to the following facts:
"1. Deputy Mark Mehrer is a certified law enforcement officer employed by the Douglas County Kansas Sheriff 's Office.
2. On April 28, 2016, Deputy Mehrer was on routine patrol in Douglas County when he observed a 1995 Chevrolet 1500 pickup truck with Kansas plate 295ATJ.
3. Deputy Mehrer ran Kansas plate 295ATJ through the Kansas Department of Revenue's file service. The registration came back to a 1995 Chevrolet 1500 pickup truck.
4. Kansas Department of Revenue files indicated the truck was registered to Charles Glover Jr. The files also indicated that Mr. Glover had a revoked driver's license in the State of Kansas.
5. Deputy Mehrer assumed the registered owner of the truck was also the driver, Charles Glover Jr.
6. Deputy Mehrer did not observe any traffic infractions, and did not attempt to identify the driver [of] the truck. Based solely on the information that the registered owner of the truck was revoked, Deputy Mehrer initiated a traffic stop.
7. The driver of the truck was identified as the defendant, Charles Glover Jr." App. to Pet. for Cert. 60-61.
The District Court granted Glover's motion to suppress. The Court of Appeals reversed, holding that "it was reasonable for [Deputy] Mehrer to infer that the driver was the owner of the vehicle" because "there were specific and articulable facts from which the officer's common-sense inference gave rise to a reasonable suspicion." 54 Kan.App.2d 377, 385, 400 P.3d 182, 188 (2017).
The Kansas Supreme Court reversed. According to the court, Deputy Mehrer did not have reasonable suspicion because his inference that Glover was behind the wheel amounted to "only a hunch" that Glover was engaging in criminal activity. 308 Kan. 590, 591, 422 P.3d 64, 66 (2018). The court further explained that Deputy Mehrer's "hunch" involved "applying and stacking unstated assumptions that are unreasonable without further factual basis," namely, that "the registered owner was likely the primary driver of the vehicle" and that "the owner will likely disregard the suspension or revocation order and continue to drive." Id., at 595-597, 422 P.3d at 68-70. We granted Kansas' petition for a writ of certiorari, 587 U. S. ----, 139 S.Ct. 1445, 203 L.Ed.2d 680 (2019), and now reverse.
II
Under this Court's precedents, the Fourth Amendment permits an officer to initiate a brief investigative traffic stop when he has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez , 449 U.S. 411, 417-418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) ; see also Terry v. Ohio , 392 U.S. 1, 21-22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." Prado Navarette v. California , 572 U.S. 393, 397, 134 S.Ct. 1683, 188 L.Ed.2d 680 (2014) (quotation altered); United States v. Sokolow , 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).
*1188 Because it is a "less demanding" standard, "reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause." Alabama v. White , 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). The standard "depends on the factual and practical considerations of everyday life on which reasonable and prudent men , not legal technicians, act." Navarette , supra , at 402, 134 S.Ct. 1683 (quoting Ornelas v. United States , 517 U.S. 690, 695, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (emphasis added; internal quotation marks omitted)). Courts "cannot reasonably demand scientific certainty ... where none exists." Illinois v. Wardlow , 528 U.S. 119, 125, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). Rather, they must permit officers to make "commonsense judgments and inferences about human behavior." Ibid. ; see also Navarette , supra , at 403, 134 S.Ct. 1683 (noting that an officer " 'need not rule out the possibility of innocent conduct' ").
III
We have previously recognized that States have a "vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles [and] that licensing, registration, and vehicle inspection requirements are being observed." Delaware v. Prouse , 440 U.S. 648, 658, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). With this in mind, we turn to whether the facts known to Deputy Mehrer at the time of the stop gave rise to reasonable suspicion. We conclude that they did.
Before initiating the stop, Deputy Mehrer observed an individual operating a 1995 Chevrolet 1500 pickup truck with Kansas plate 295ATJ. He also knew that the registered owner of the truck had a revoked license and that the model of the truck matched the observed vehicle. From these three facts, Deputy Mehrer drew the commonsense inference that Glover was likely the driver of the vehicle, which provided more than reasonable suspicion to initiate the stop.
The fact that the registered owner of a vehicle is not always the driver of the vehicle does not negate the reasonableness of Deputy Mehrer's inference. Such is the case with all reasonable inferences. The reasonable suspicion inquiry "falls considerably short" of 51% accuracy, see United States v. Arvizu , 534 U.S. 266, 274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002), for, as we have explained, "[t]o be reasonable is not to be perfect," Heien v. North Carolina , 574 U.S. 54, 60, 135 S.Ct. 530, 190 L.Ed.2d 475 (2014).
Glover's revoked license does not render Deputy Mehrer's inference unreasonable either. Empirical studies demonstrate what common experience readily reveals: Drivers with revoked licenses frequently continue to drive and therefore to pose safety risks to other motorists and pedestrians. See, e.g. , 2 T. Neuman et al., National Coop. Hwy. Research Program Report 500: A Guide for Addressing Collisions Involving Unlicensed Drivers and Drivers With Suspended or Revoked Licenses, p. III-1 (2003) (noting that 75% of drivers with suspended or revoked licenses continue to drive); National Hwy. and Traffic Safety Admin., Research Note: Driver License Compliance Status in Fatal Crashes 2 (Oct. 2014) (noting that approximately 19% of motor vehicle fatalities from 2008-2012 "involved drivers with invalid licenses").
Although common sense suffices to justify this inference, Kansas law reinforces that it is reasonable to infer that an individual with a revoked license may continue driving. The State's license-revocation scheme covers drivers who have already *1189 demonstrated a disregard for the law or are categorically unfit to drive. The Division of Vehicles of the Kansas Department of Revenue (Division) "shall" revoke a driver's license upon certain convictions for involuntary manslaughter, vehicular homicide, battery, reckless driving, fleeing or attempting to elude a police officer, or conviction of a felony in which a motor vehicle is used. Kan. Stat. Ann. §§ 8-254(a), 8-252. Reckless driving is defined as "driv[ing] any vehicle in willful or wanton disregard for the safety of persons or property." § 8-1566(a). The Division also has discretion to revoke a license if a driver "[h]as been convicted with such frequency of serious offenses against traffic regulations governing the movement of vehicles as to indicate a disrespect for traffic laws and a disregard for the safety of other persons on the highways," "has been convicted of three or more moving traffic violations committed on separate occasions within a 12-month period," "is incompetent to drive a motor vehicle," or "has been convicted of a moving traffic violation, committed at a time when the person's driving privileges were restricted, suspended[,] or revoked." §§ 8-255(a)(1)-(4). Other reasons include violating license restrictions, § 8-245(c), being under house arrest, § 21-6609(c), and being a habitual violator, § 8-286, which Kansas defines as a resident or nonresident who has been convicted three or more times within the past five years of certain enumerated driving offenses, § 8-285. The concerns motivating the State's various grounds for revocation lend further credence to the inference that a registered owner with a revoked Kansas driver's license might be the one driving the vehicle.
IV
Glover and the dissent respond with two arguments as to why Deputy Mehrer lacked reasonable suspicion. Neither is persuasive.
A
First, Glover and the dissent argue that Deputy Mehrer's inference was unreasonable because it was not grounded in his law enforcement training or experience. Nothing in our Fourth Amendment precedent supports the notion that, in determining whether reasonable suspicion exists, an officer can draw inferences based on knowledge gained only through law enforcement training and experience. We have repeatedly recognized the opposite. In Navarette , we noted a number of behaviors-including driving in the median, crossing the center line on a highway, and swerving-that as a matter of common sense provide "sound indicia of drunk driving." 572 U.S. at 402, 134 S.Ct. 1683. In Wardlow , we made the unremarkable observation that "[h]eadlong flight-wherever it occurs-is the consummate act of evasion" and therefore could factor into a police officer's reasonable suspicion determination. 528 U.S. at 124, 120 S.Ct. 673. And in Sokolow , we recognized that the defendant's method of payment for an airplane ticket contributed to the agents' reasonable suspicion of drug trafficking because we "fe[lt] confident" that "[m]ost business travelers ... purchase airline tickets by credit card or check" rather than cash. 490 U.S. at 8-9, 109 S.Ct. 1581. So too here. The inference that the driver of a car is its registered owner does not require any specialized training; rather, it is a reasonable inference made by ordinary people on a daily basis.
The dissent reads our cases differently, contending that they permit an officer to use only the common sense derived from his "experiences in law enforcement." Post , at 1196 (opinion of SOTOMAYOR, J.). Such a standard defies the "common *1190 sense" understanding of common sense, i.e. , information that is accessible to people generally, not just some specialized subset of society. More importantly, this standard appears nowhere in our precedent. In fact, we have stated that reasonable suspicion is an "abstract" concept that cannot be reduced to "a neat set of legal rules," Arvizu , 534 U.S. at 274, 122 S.Ct. 744 (internal quotation marks omitted), and we have repeatedly rejected courts' efforts to impose a rigid structure on the concept of reasonableness, ibid. ; Sokolow , 490 U.S. at 7-8, 109 S.Ct. 1581. This is precisely what the dissent's rule would do by insisting that officers must be treated as bifurcated persons, completely precluded from drawing factual inferences based on the commonly held knowledge they have acquired in their everyday lives.
The dissent's rule would also impose on police the burden of pointing to specific training materials or field experiences justifying reasonable suspicion for the myriad infractions in municipal criminal codes. And by removing common sense as a source of evidence, the dissent would considerably narrow the daylight between the showing required for probable cause and the "less stringent" showing required for reasonable suspicion. Prouse , 440 U.S. at 654, 99 S.Ct. 1391 ; see White , 496 U.S. at 330, 110 S.Ct. 2412. Finally, it would impermissibly tie a traffic stop's validity to the officer's length of service. See Devenpeck v. Alford , 543 U.S. 146, 154, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004). Such requirements are inconsistent with our Fourth Amendment jurisprudence, and we decline to adopt them here.
In reaching this conclusion, we in no way minimize the significant role that specialized training and experience routinely play in law enforcement investigations. See, e.g. , Arvizu , 534 U.S. at 273-274, 122 S.Ct. 744. We simply hold that such experience is not required in every instance.
B
Glover and the dissent also contend that adopting Kansas' view would eviscerate the need for officers to base reasonable suspicion on "specific and articulable facts" particularized to the individual, see Terry , 392 U.S. at 21, 88 S.Ct. 1868, because police could instead rely exclusively on probabilities. Their argument carries little force.
As an initial matter, we have previously stated that officers, like jurors, may rely on probabilities in the reasonable suspicion context. See Sokolow , 490 U.S. at 8-9, 109 S.Ct. 1581 ; Cortez , 449 U.S. at 418, 101 S.Ct. 690. Moreover, as explained above, Deputy Mehrer did not rely exclusively on probabilities. He knew that the license plate was linked to a truck matching the observed vehicle and that the registered owner of the vehicle had a revoked license. Based on these minimal facts, he used common sense to form a reasonable suspicion that a specific individual was potentially engaged in specific criminal activity-driving with a revoked license. Traffic stops of this nature do not delegate to officers "broad and unlimited discretion" to stop drivers at random. United States v. Brignoni-Ponce , 422 U.S. 873, 882, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). Nor do they allow officers to stop drivers whose conduct is no different from any other driver's. See Brown v. Texas , 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). Accordingly, combining database information and commonsense judgments in this context is fully consonant with this Court's Fourth Amendment precedents.[1]
*1191 V
This Court's precedents have repeatedly affirmed that " 'the ultimate touchstone of the Fourth Amendment is "reasonableness." ' " Heien , 574 U.S. at 60, 135 S.Ct. 530 (quoting Riley v. California , 573 U.S. 373, 381, 134 S.Ct. 2473, 189 L.Ed.2d 430 (2014) ). Under the totality of the circumstances of this case, Deputy Mehrer drew an entirely reasonable inference that Glover was driving while his license was revoked.
We emphasize the narrow scope of our holding. Like all seizures, "[t]he officer's action must be 'justified at its inception.' " Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty. , 542 U.S. 177, 185, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004) (quoting United States v. Sharpe , 470 U.S. 675, 682, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) ). "The standard takes into account the totality of the circumstances-the whole picture." Navarette , 572 U.S. at 397, 134 S.Ct. 1683 (internal quotation marks omitted). As a result, the presence of additional facts might dispel reasonable suspicion. See Terry , supra , at 28, 88 S.Ct. 1868. For example, if an officer knows that the registered owner of the vehicle is in his mid-sixties but observes that the driver is in her mid-twenties, then the totality of the circumstances would not "raise a suspicion that the particular individual being stopped is engaged in wrongdoing." Cortez , 449 U.S. at 418, 101 S.Ct. 690 ; Ornelas , 517 U.S. at 696, 116 S.Ct. 1657 (" '[e]ach case is to be decided on its own facts and circumstances' " (quoting Ker v. California , 374 U.S. 23, 33, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) )). Here, Deputy Mehrer possessed no exculpatory information-let alone sufficient information to rebut the reasonable inference that Glover was driving his own truck-and thus the stop was justified.[2]
* * *
For the foregoing reasons, we reverse the judgment of the Kansas Supreme Court, and we remand the case for further proceedings not inconsistent with this opinion.
It is so ordered.
Justice KAGAN, with whom Justice GINSBURG joins, concurring.
When you see a car coming down the street, your common sense tells you that the registered owner may well be behind the wheel. See ante, at 1188, 1191. Not always, of course. Families share cars; friends borrow them. Still, a person often buys a vehicle to drive it himself. So your suspicion that the owner is driving would be perfectly reasonable. See ibid.
Now, though, consider a wrinkle: Suppose you knew that the registered owner of the vehicle no longer had a valid driver's *1192 license. That added fact raises a new question. What are the odds that someone who has lost his license would continue to drive? The answer is by no means obvious. You might think that a person told not to drive on pain of criminal penalty would obey the order-so that if his car was on the road, someone else (a family member, a friend) must be doing the driving. Or you might have the opposite intuition-that a person's reasons for driving would overcome his worries about violating the law, no matter the possible punishment. But most likely (let's be honest), you just wouldn't know. Especially if you've not had your own license taken away, your everyday experience has given you little basis to assess the probabilities. Your common sense can therefore no longer guide you.
Even so, Deputy Mark Mehrer had reasonable suspicion to stop the truck in this case, and I join the Court's opinion holding as much. Crucially for me, Mehrer knew yet one more thing about the vehicle's registered owner, and it related to his proclivity for breaking driving laws. As the Court recounts, Mehrer learned from a state database that Charles Glover, the truck's owner, had had his license revoked under Kansas law. See ante, at 1187. And Kansas almost never revokes a license except for serious or repeated driving offenses. See Kan. Stat. Ann. § 8-254 (2001); ante, at 1188 -1189. Crimes like vehicular homicide and manslaughter, or vehicular flight from a police officer, provoke a license revocation; so too do multiple convictions for moving traffic violations within a short time. See ante, at 1188 - 1189. In other words, a person with a revoked license has already shown a willingness to flout driving restrictions. That fact, as the Court states, provides a "reason[ ] to infer" that such a person will drive without a license-at least often enough to warrant an investigatory stop. Ibid. And there is nothing else here to call that inference into question. That is because the parties' unusually austere stipulation confined the case to the facts stated above-i.e., that Mehrer stopped Glover's truck because he knew that Kansas had revoked Glover's license.
But as already suggested, I would find this a different case if Kansas had barred Glover from driving on a ground that provided no similar evidence of his penchant for ignoring driving laws. Consider, for example, if Kansas had suspended rather than revoked Glover's license. Along with many other States, Kansas suspends licenses for matters having nothing to do with road safety, such as failing to pay parking tickets, court fees, or child support. See Kan. Stat. Ann. § 8-2110(b) (2018 Cum. Supp.); see also, e.g. , N. J. Stat. Ann. § 39:4-139.10 (West Supp. 2019) ; Ark. Code Ann. § 9-14-239 (Supp. 2019). Indeed, several studies have found that most license suspensions do not relate to driving at all; what they most relate to is being poor. See Brief for Fines and Fees Justice Center et al. as Amici Curiae 7. So the good reason the Court gives for thinking that someone with a revoked license will keep driving-that he has a history of disregarding driving rules-would no longer apply. And without that, the case for assuming that an unlicensed driver is at the wheel is hardly self-evident. It would have to rest on an idea about the frequency with which even those who had previously complied with driving laws would defy a State's penalty-backed command to stay off the roads. But where would that idea come from? As discussed above, I doubt whether our collective common sense could do the necessary work. See supra, at 1191 - 1192. Or otherwise said, I suspect that any common sense invoked in this altered context would not much differ from a "mere 'hunch' "-and so "not create reasonable suspicion."
*1193 Prado Navarette v. California , 572 U.S. 393, 397, 134 S.Ct. 1683, 188 L.Ed.2d 680 (2014) (quoting Terry v. Ohio , 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ).
And even when, as under the revocation scheme here, a starting presumption of reasonable suspicion makes sense, the defendant may show that in his case additional information dictates the opposite result. The Court is clear on this point, emphasizing that under the applicable totality-of-the-circumstances test, "the presence of additional facts might dispel reasonable suspicion" even though an officer knows that a car on the road belongs to a person with a revoked license. Ante, at 1186; see ante, at 1191 (stating that further information may "negat[e] an inference that the owner is the driver of the vehicle"). Just as the Court once said of a trained drug-detection dog's "alert," the license-revocation signal is always subject to a defendant's challenge, whether through cross-examination of the officer or introduction of his own fact or expert witnesses. Florida v. Harris , 568 U.S. 237, 247, 133 S.Ct. 1050, 185 L.Ed.2d 61 (2013).
That challenge may take any number of forms. The Court offers a clear example of observational evidence dispelling reasonable suspicion: if the officer knows the registered owner of a vehicle is an elderly man, but can see the driver is a young woman. See ante, at 1191. Similarly (if not as cut-and-dry), when the officer learns a car has two or more registered owners, the balance of circumstances may tip away from reasonable suspicion that the one with the revoked license is driving. And so too, the attributes of the car may be relevant. Consider if a car bears the markings of a peer-to-peer carsharing service; or compare the likelihoods that someone other than the registered owner is driving (1) a family minivan and (2) a Ferrari. The officer himself may have a wealth of accumulated information about such matters, and the defendant may probe what that knowledge suggests about the stop at issue.
Such a challenge may also use statistical evidence, which is almost daily expanding in sophistication and scope. States or municipalities often keep information about "hit rates" in stops like this one-in other words, the frequency with which those stops discover unlicensed drivers behind the wheel. See generally Brief for Andrew Manuel Crespo as Amicus Curiae 23-27. Somewhat less direct but also useful are state and local data (collected by governments, insurance companies, and academics alike) about the average number of drivers for each registered automobile and the extent to which unlicensed persons continue to drive. See id., at 13-18. (If, to use an extreme example, every car had 10 associated drivers, and losing a license reduced driving time by 90%, an officer would not have reasonable suspicion for a stop.) Here too, defendants may question testifying officers about such information. Indeed, an officer may have his own hit rate, which if low enough could itself negate reasonable suspicion. See, e.g. , United States v. Cortez-Galaviz , 495 F.3d 1203, 1208-1209 (C.A.10 2007) (Gorsuch, J.) (considering, as part of the reasonable suspicion inquiry, the frequency of an officer's misses and the accuracy of the database on which he relied).*
*1194 In this strange case, contested on a barebones stipulation, the record contains no evidence of these kinds. There is but a single, simple fact: A police officer learned from a state database that a car on the road belonged to a person with a revoked license. Given that revocations in Kansas nearly always stem from serious or repeated driving violations, I agree with the Court about the reasonableness of the officer's inference that the owner, "Glover[,] was driving while his license was revoked." Ante, at 1191. And because Glover offered no rebuttal, there the matter stands. But that does not mean cases with more complete records will all wind up in the same place. A defendant like Glover may still be able to show that his case is different-that the "presence of additional facts" and circumstances "dispel[s] reasonable suspicion." Ibid . Which is to say that in more fully litigated cases, the license-revocation alert does not (as it did here) end the inquiry. It is but the first, though no doubt an important, step in assessing the reasonableness of the officer's suspicion.

The dissent contends that this approach "pave[s] the road to finding reasonable suspicion based on nothing more than a demographic profile." Post , at 1197 (opinion of SOTOMAYOR, J.). To alleviate any doubt, we reiterate that the Fourth Amendment requires, and Deputy Mehrer had, an individualized suspicion that a particular citizen was engaged in a particular crime. Such a particularized suspicion would be lacking in the dissent's hypothetical scenario, which, in any event, is already prohibited by our precedents. See United States v. Brignoni-Ponce , 422 U.S. 873, 876, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (holding that it violated the Fourth Amendment to stop and "question [a vehicle's] occupants [about their immigration status] when the only ground for suspicion [was] that the occupants appear[ed] to be of Mexican ancestry").

The dissent argues that this approach impermissibly places the burden of proof on the individual to negate the inference of reasonable suspicion. Post , at 3. Not so. As the above analysis makes clear, it is the information possessed by the officer at the time of the stop, not any information offered by the individual after the fact, that can negate the inference.

The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co. , 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.