

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

**NO. PD-0561-20**

---

**JACOB MATTHEW JOHNSON, Appellant**

**v.**

**THE STATE OF TEXAS**

---

**ON STATE'S PETITION FOR DISCRETIONARY REVIEW
FROM THE FOURTEENTH COURT OF APPEALS
BRAZORIA COUNTY**

---

KELLER, P.J., delivered the opinion of the Court in which HERVEY, YEARY, NEWELL, KEEL, AND SLAUGHTER, JJ., joined. WALKER, J., filed a dissenting opinion. RICHARDSON, J., concurred. MCCLURE, J., dissented.

An officer activated his emergency lights and approached a parked vehicle at a "park and ride" lot. We conclude that the officer had reasonable suspicion to conduct an investigative detention because the parking lot had a significant association with criminal activity and because the occupants of the vehicle engaged in activity that appeared secretive and was unusual for the time and place. Consequently, we reverse the judgment of the court of appeals and affirm the judgment of the trial court.

# I. BACKGROUND

## A. Suppression Hearing

The only witness at the suppression hearing was Sergeant Robert Cox, from the patrol division of the Brazoria County Sheriff's Office. He testified about events occurring on August 28, 2016, at a park-and-ride parking lot.

The main use of the park-and-ride was "during the daytime for people that go into plant traffic and park," but it was open twenty-four hours. The park-and-ride was close to a bar, and because the bar's own parking lot was small, patrons often parked at the park-and-ride and walked over. Sergeant Cox knew that the park-and-ride was a place where "a variety of criminal activity" took place, including burglaries of motor vehicles, public lewdness, and illicit drugs. In his ten years of patrolling the area, Sergeant Cox could not say how many times he had been at the park-and-ride on calls, but it had been "a lot." In the months around August 28, he personally had been at the park-and-ride on calls "maybe three or four" times. When he was not on a call, but was simply patrolling the park-and-ride, the sergeant's general practice was to drive around the lot and shine a spotlight on the vehicles.

Shortly after midnight, Sergeant Cox saw a vehicle parked by itself away from where other vehicles were parked. This solitary vehicle's headlights and other outside lights were off, and there were no lights on inside the vehicle. When he shined his spotlight on the vehicle, Sergeant Cox could tell that there were two occupants and that there was movement inside the vehicle. In Sergeant Cox's experience, it was out of the ordinary for someone to be inside a vehicle at the park-and-ride after midnight "[w]ith no other vehicle there to pick them up and give them a ride."

The sergeant pulled to a stop 10 to 15 yards behind the vehicle and activated his overhead

emergency lights.[1]  He activated those lights to start the recording equipment and also to let the occupants of the vehicle know he was a police officer "and so nobody shoots [him]."  He approached the vehicle on foot, made contact on the driver's side using caution, and identified himself.  At some point, the driver's side window was rolled down, and once that occurred, Sergeant Cox smelled marijuana.  At that point, the sergeant also noticed that Appellant was wearing baggy shorts and that his shorts were unbuttoned and unzipped.

During the hearing, defense counsel asked the sergeant, "And you had—you know, so if you turned on your overhead lights, it would be like a normal police car pulling somebody over if you got a traffic ticket.  Right?  I mean, that's what your vehicle looked like?"  Sergeant Cox responded, "Yes, sir."

The State sought to offer a copy of the video recording captured by the patrol car.  Defense counsel objected that the video recording was irrelevant because the events it depicted occurred after the defendant was seized.  The defense theory was that a seizure of Appellant occurred once the overhead emergency lights were activated and that the sergeant did not have reasonable suspicion to initiate that seizure.  Since the recording captured only events that occurred after the overhead emergency lights were activated, the defense reasoned, the events on the recording would necessarily be post-seizure.[2]  The trial court sustained the defense objection.  It agreed with the defense "somewhat" and concluded that the issue before it was whether the officer had reasonable suspicion.

_____

[1]  In response to a question suggesting that his vehicle was "not fully blocking in the view," the sergeant indicated that it was not.

[2]  The State suggested that the recording might include some footage immediately preceding the activation of the overhead lights.  The defense indicated a willingness to allow any such portion of the video to be played but maintained that the bulk of the video, occurring after the overhead emergency lights were activated, should be excluded.

## B. Trial Court's Findings

The trial court made the following written findings of fact that seem relevant to the inquiry before us:

2. Sergeant Robert Cox testified that he was on routine patrol around 12 AM.

3. Sergeant Cox further testified that as part of his routine patrol, he regularly checks the park and ride located at the intersection of FM 2004 and FM 523. He regularly spotlights vehicles parked overnight in that park and ride to deter drug activity and burglaries.

4. The park and ride at the intersection of FM2004 and FM 523 is a high crime area for burglaries of motor vehicles, drug crimes, and public lewdness. Sergeant Cox testified that he had personally made several arrests in the months prior to this offense for such offenses in that park and ride.

5. While conducting his routine patrol on or about the day in question, Sergeant Cox spotted the defendant's vehicle parked in the park and ride and observed movement inside. Other vehicles were present in the park and ride and that [sic] defendant's vehicle was parked away from the other vehicles.

6. Sergeant Cox parked behind defendant's vehicle then turned on his overhead lights.

7. Sergeant Cox did not block the defendant's vehicle from leaving when he parked behind it.

8. Sergeant Cox then approached defendant's vehicle.

9. Once the defendant rolled down his window, Sergeant Cox observed the defendant's pants to be undone and detected the smell of marihuana.

The trial court issued the following conclusions of law:

1. Officers do not need reasonable suspicion to initiate a consensual encounter with a citizen. Sergeant Cox's initial encounter with the defendant was a proper consensual encounter that later evolved into an investigative detention.

2. The sole fact that Sergeant Cox activat[ed] his overhead lights alone did not elevate the consensual encounter into an investigative detention.

3. If the initial encounter was a detention, it was properly supported by reasonable suspicion of criminal activity as necessary to detain the defendant based on specific, articulable facts, namely: his presence in the park and ride, a high crime area, after the park and ride's normal operating hours.[3]

## C. Appeal

The court of appeals concluded that a seizure had occurred before Appellant rolled down his car window.[4] That court observed that " fact patterns involving a police officer's use of a patrol car's overhead emergency lights are frequently held sufficient to constitute an investigative detention of a citizen, whether in a parked car or a moving car."[5] But, the court of appeals said, "[C]ourts must consider the circumstances" and ultimately "context matters."[6] The court noted that a police car might pull to the side of the road at night and activate emergency lights for safety purposes.[7] After reviewing the circumstances of Appellant's case in the light most favorable to the trial court's ruling, the court of appeals concluded that the evidence demonstrated that Officer Cox "through a show of authority, sufficiently conveyed the message that appellant was not free to leave the Parking Lot or to ignore a request to lower the car window."[8]

The court of appeals further concluded that Sergeant Cox lacked reasonable suspicion to initiate the seizure.[9] The appellate court first took issue with the trial court's conclusion that the

---

[3] Record references and citations omitted.

[4] *Johnson v. State*, 602 S.W.3d 50, 58 (Tex. App.—Houston [14th Dist.] 2020).

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.* at 61.

park-and-ride was a high crime area.[10] The court of appeals noted that the Sergeant testified to responding to three or four calls during a time period and that he also testified that burglaries of motor vehicles, drug crimes, and public lewdness occurred at the park-and-ride, but the court of appeals stated that the sergeant did not say that the calls were for those crimes or that the calls resulted in any arrests.[11] The appellate court also stated that Sergeant Cox did not testify that the park-and-ride was a high crime area.[12] The court of appeals concluded that the record does not support the trial court's finding that the park-and-ride "is a high crime area for burglaries of motor vehicles, drug crimes, and public lewdness and that Officer Cox testified he had made several arrests for these types of offenses in the months prior to the charged offense."[13] Consequently, the court of appeals disregarded these findings.[14]

Next, the court of appeals noted that the time of day and level of criminal activity in the area are relevant to reasonable suspicion but that "courts generally require something else particular to the suspect's behavior to justify a suspicion of criminal activity."[15] The appellate court pointed to one of its earlier cases, in which reasonable suspicion was lacking, when the following factors were present:

(1) it was 2:30 a.m.; (2) while driving on a highway, the officer saw a truck parked

---

[10] *Id.* at 59-60.

[11] *Id.*

[12] *Id.* at 60.

[13] *Id.*

[14] *Id.*

[15] *Id.* at 61

behind a shopping center; (3) the businesses in the shopping center were closed; (4) there had been burglaries at the shopping center in the past, though the police officer did not say how recent or how many; (5) the officer turned into the parking lot shortly afterwards and discovered that the truck was gone; (6) the officer then turned onto an adjoining road and within fifteen to twenty seconds came upon a truck that he believed to be the same as the one at the shopping center; and (7) the officer wanted to identify the truck.[16]

After analyzing the earlier case, the court of appeals concluded that, even in the light most favorable to the trial court's ruling, the record in this case did not reasonably support the trial court's determination that Sergeant Cox had the requisite reasonable suspicion.[17] Ultimately, the court of appeals reversed the trial court's judgment and remanded the case for further proceedings.[18]

The concurring opinion would have held that "flashing overhead emergency lights is synonymous with an instruction to stop and not leave."[19] The concurrence would also have found that the time of day was not suspicious because the park-and-ride was open twenty-four hours a day.[20]

## II. ANALYSIS

The State argues that Sergeant Cox did not initiate a seizure when he activated his emergency lights. The State also contends that Sergeant Cox had reasonable suspicion to conduct an

---

[16] *Id.* at 60-61 (discussing *Klare v. State*, 76 S.W.3d 68, 71 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd)).

[17] *Id.* at 61.

[18] *Id.* at 62.

[19] *Id.* at 69 (Hassan, J., concurring).

[20] *Id.* at 65-66. The concurrence made other arguments that appear to be consistent with the majority opinion that we need not detail here. *See id.* at 67-69.

investigative detention. Assuming, without deciding, that a seizure did occur,[21] we agree with the State that Sergeant Cox had reasonable suspicion.

Under the Fourth Amendment, a police officer may conduct an investigative detention if the "reasonable suspicion" standard is satisfied.[22] "Reasonable suspicion" means "a particularized and objective basis for suspecting the particular person stopped of criminal activity."[23] Stated another way, "Reasonable suspicion exists if the officer has specific articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably suspect that a particular person has engaged or is (or soon will be) engaged in criminal activity."[24] A mere "hunch" is not sufficient, but the level of suspicion required is less than what is necessary for probable cause and "can be established with information that is different in quantity or content than that required to establish probable cause."[25] The articulable facts need only show "that some activity out of the ordinary has occurred, some suggestion to connect the detainee to the unusual activity, and some indication that the unusual activity is related to crime."[26] The officer need not be able to "pinpoint a particular penal infraction."[27] And reasonable suspicion "does not require negating the possibility

---

[21] *See Garcia-Cantu v. State*, 253 S.W.3d 236, 245 n.43 (Tex. Crim. App. 2008) (use of police emergency lights "frequently held sufficient to constitute a detention or seizure of a citizen, either in a parked or moving car") (citing cases from other jurisdictions).

[22] *Kansas v. Glover*, 140 S. Ct. 1183, 1187-88 (2020).

[23] *Id.* at 1187.

[24] *State v. Cortez*, 543 S.W.3d 198, 204 (Tex. Crim. App. 2018).

[25] *Glover*, 140 S. Ct. at 1187-88.

[26] *Derichsweiler v. State*, 348 S.W.3d 906, 916 (Tex. Crim. App. 2011).

[27] *Id.*

of innocent conduct."[28]

The "reasonable suspicion" standard "depends on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."[29] In formulating reasonable suspicion, a police officer can draw on his own experience and specialized training.[30] We review a determination of reasonable suspicion by looking at the totality of the circumstances.[31] Sometimes, a police officer's limited knowledge of the circumstances can give rise to reasonable suspicion, even though "the presence of additional facts might dispel reasonable suspicion."[32]

Some of the trial court's fact findings[33] relevant to reasonable suspicion slightly overstate what is actually in the record. The statement in Finding 3 that Sergeant Cox "regularly spotlights vehicles parked overnight" in the park-and-ride is based on testimony that Sergeant Cox regularly spotlights any vehicles parked there at night. That some vehicles are likely parked "overnight" appears to be a rational inference from the record, but nothing in the testimony suggested that Sergeant Cox would know which vehicles would ultimately be parked overnight. Finding 4 mentions motor-vehicle burglaries, drug crimes, and public lewdness and says that "Sergeant Cox testified that he had personally made several arrests in the months prior to this offense for such

---

[28] *Ramirez-Tamayo v. State*, 537 S.W.3d 29, 39 (Tex. Crim. App. 2017).

[29] *Glover*, 140 S. Ct. at 1188 (emphasis removed).

[30] *Ramirez-Tamayo*, 537 S.W.3d at 36.

[31] *Cortez*, 543 S.W.3d at 204.

[32] *Glover*, 140 S. Ct. at 1191.

[33] By "factual findings," we refer in this case both to the explicit findings of fact and to statements in the conclusions of law that amount to a fact finding.

offenses in that park and ride," but as the court of appeals pointed out, Sergeant Cox did not explicitly testify that his calls to the park-and-ride were for those crimes or that he made arrests during those calls. The trial court would have been on firmer ground to *infer* from Sergeant Cox's testimony that the calls were for those crimes and resulted in arrests, and then the question would be whether such inferences were reasonable. And in Conclusion 3, the trial court referred to Appellant's vehicle being present "after the park and ride's normal operating hours," when in fact the park-and-ride was open twenty-four hours. Sergeant Cox did testify, however, that the main use of the lot was during the daytime and that it was out of the ordinary for somebody to be parked in their car after midnight in that park-and-ride with no one there to pick them up.

Despite some imprecision, we can say two general things about the findings and conclusions that support the trial court's ruling. First, although the trial court did not make an express assessment of Sergeant Cox's credibility, all of the findings accept his credibility on various points and, taken together, indicate that the trial court accepted his credibility in all respects. Second, even where the findings and conclusions are not strictly correct, they can be traced back to facts established by Sergeant Cox's testimony that are relevant to—though perhaps not as strongly supportive of—reasonable suspicion. In the previous paragraph, we outlined three such situations.

Sergeant Cox was aware of at least seven facts relevant to reasonable suspicion before he turned on his overhead emergency lights. Those facts, along with the trial-court findings to which each fact relates, are as follows:

> 1. The park-and-ride was a place that had a significant association with criminal activity. Finding 3 ("to deter drug activity and burglaries"), Finding 4 (in its entirety), and Conclusion 3 ("high crime area").

> 2. In Sergeant Cox's experience, it was unusual for a person to be inside his vehicle

while it was parked at the park-and-ride after midnight without another vehicle there to give him a ride.  Finding 3 ("vehicles parked overnight in that park and ride"), Conclusion 3 ("his presence in the park and ride . . . after the park-and-ride's normal operating hours").

3. At least one person was inside Appellant's vehicle while it was parked at the park-and-ride after midnight.  Finding 2 ("on routine patrol around 12 AM"),  Finding 5 ("While conducting his routine patrol . . . spotted the defendant's vehicle parked in the park and ride and observed movement inside"), Conclusion 3 ("his presence in the park and ride . . . after the park-and-ride's normal operating hours").

4. At least one person in the vehicle was awake because there was movement in the vehicle. Finding 5 ("observed movement inside"), Conclusion 3 ("his presence in the park and ride . . . after the park-and-ride's normal operating hours).

5. The vehicle's lights were off.  Conclusion 3 ("his presence in the park and ride . . . after the park-and-ride's normal operating hours).

6. There were no other lights on inside the vehicle.  Conclusion 3 ("his presence in the park and ride . . . after the park-and-ride's normal operating hours).

7. The vehicle was parked away from the other vehicles in the park-and-ride.  Finding 5 ("Other vehicles were present in the park and ride and that defendant's vehicle was parked away from the other vehicles.").

Regarding the first fact, we need not decide whether the record supports the trial court's finding that the park-and-ride was a "high crime area."  The court of appeals's point that Sergeant Cox did not testify explicitly that the park-and-ride was a "high crime area" is true but does not necessarily undermine the trial court's finding.  The trial court's finding that the park-and-ride was a "high crime area" was an inference based on the testimony.  Nevertheless, it is enough for our purposes to hold that the testimony at least supports an inference that the park-and-ride had a significant association with criminal activity.  The place had been the site of at least three different types of criminal activity, with each type having been committed multiple times.  Sergeant Cox had responded to calls to the park-and-ride "a lot" of times, and in the months around the date of this

offense, he had personally answered three or four calls to it.

The second fact was explicitly testified to by Sergeant Cox. The trial court somewhat overstated the evidence in Conclusion 3 when it said that Appellant's vehicle was parked after normal operating hours; the park-and-ride was open twenty-four hours, so all hours were "normal operating hours." But Sergeant Cox did testify that someone's presence at the park-and-ride could be abnormal under certain circumstances given the lateness of the hour: that sitting in a parked car at the park-and-ride after midnight without another car present to give the person a ride was out of the ordinary. The trial court's reference to "vehicles parked overnight" in Finding 3 was consistent with Sergeant Cox's testimony that, once the hour became late enough, people were leaving their cars in the park-and-ride and obtaining rides home. In fact, if it were not for the presence of the nearby bar, there would normally be no reason for anyone to sit in their cars after midnight at the park-and-ride. The ostensible purpose of a park-and-ride lot is to provide a place to park while one uses public transportation. No testimony was elicited about whether buses were still running at midnight, but Sergeant Cox did testify that, even though people from the nearby bar would park at the park-and-ride, its main use was during the daytime for plant workers.

The third fact was explicitly testified to by Sergeant Cox and can be derived from considering several of the trial court's findings together. The trial court's Finding 2 said the sergeant was on patrol around 12 a.m., and Finding 5 said the sergeant spotted Appellant's vehicle and the movement inside while on patrol. And Conclusion 3's reference to Appellant's presence "after normal operating hours" was an implicit reference to the lateness of the hour.

The fourth fact, that someone in the vehicle was awake, is a rational inference from seeing movement inside the vehicle. Sergeant Cox testified to seeing movement inside the vehicle, and

the trial court explicitly found that Sergeant Cox saw such movement.

Sergeant Cox explicitly testified to the fifth and sixth facts. As we will explain more fully below, these facts relate to the oddness of Appellant's presence at the park-and-ride after midnight, and are implicated under the trial court's Conclusion 3.

Finally, the seventh fact was testified to by Sergeant Cox and explicitly found by the trial court.

Viewed together, here is what we have: Sergeant Cox knew that the park-and-ride had a significant association with criminal activity. He also knew that, after midnight, people did usually not loiter inside their vehicles: they either got in their vehicles and drove away immediately, or they arranged for a ride home in someone else's vehicle. Sergeant Cox also knew that Appellant's vehicle was occupied after midnight, that the vehicle was not driving away (the lights were off), and that there was not a "ride-home" vehicle next to Appellant's vehicle. Sergeant Cox could also surmise that the occupant was not waiting for another vehicle because there was no light on inside the vehicle. One might expect to see some sort of light in the occupied vehicle, such as from a cell-phone calling the ride or monitoring its progress, a CD player playing a song while the person waits, an internal light on to read a book, or the light of a smart phone occupying one's time. The interior of a car could be dark if the occupant was asleep but because Sergeant Cox had seen movement, he knew at least one occupant of the car was awake. And Appellant's vehicle being in a spot away from the other vehicles might not mean much by itself. But when combined with the occupant's out-of-the ordinary presence at the park-and-ride after midnight, the relative seclusion of the vehicle suggested that the occupant or occupants were engaged in behavior that needed to be hidden from others. And the inference that behavior was being hidden was reinforced by the absence of lighting

in the vehicle.

The unusual and secretive behavior of the occupants of Appellant's vehicle at least gave rise to an objectively reasonable suspicion that some sort of crime was being committed or contemplated. Drug crimes had occurred with at least some frequency at the park-and-ride, and a dark, isolated vehicle would easily facilitate such crimes. Or such a vehicle could be a waiting spot for the commission of some other crime, such as burglarizing someone else's vehicle or burglarizing a business, such as the nearby bar. Or there might be some other unknown crime that the occupant of such a vehicle intends to commit. As we have explained, an officer does not have to pinpoint an exact penal offense. Here, the unusual and secretive nature of Appellant's behavior was sufficient to give rise to a reasonable suspicion "that *something* of an apparently criminal nature is brewing."[34]

There might be an innocent explanation for someone sitting in his car in the dark at the park-and-ride after midnight in a relatively isolated parking spot. And assuming multiple occupants (two, according to Sergeant Cox's testimony), they could be talking or passing the time in some other manner that does not require light. But as we have already explained, reasonable suspicion does not require negating the possibility of an innocent explanation. "It matters not that all of this conduct could be construed as innocent of itself; for purposes of a reasonable-suspicion analysis, it is enough that the totality of the circumstances, viewed objectively and in the aggregate, suggests the realistic possibility of a criminal motive, however amorphous, that was about to be acted upon."[35] And as we have also pointed out earlier, reasonable suspicion is a less demanding standard than probable cause. It is a relatively low hurdle. Sergeant Cox was confronted with unusual circumstances that, from an

---

[34] *See Derichsweiler*, 348 S.W.3d at 917 (emphasis in original).

[35] *Id.*

objective standpoint, gave rise to reason to believe that something criminal had occurred, was occurring, or was about to occur.

Consequently, we hold that the court of appeals erred in concluding that Sergeant Cox lacked reasonable suspicion to conduct an investigative detention.

We reverse the judgment of the court of appeals and affirm the judgment of the trial court.

Delivered: May 12, 2021

Publish