# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 22-1243

———————————————

United States of America

*Plaintiff - Appellee*

v.

Jeremiah Ezekiel Brown

*Defendant - Appellant*

——————————

Appeal from United States District Court
for the Western District of Missouri - Jefferson City

——————————

Submitted: January 9, 2023
Filed: May 9, 2023
[Unpublished]

——————————

Before SMITH, Chief Judge, WOLLMAN and LOKEN, Circuit Judges.

——————————

PER CURIAM.

A jury convicted Jeremiah Ezekiel Brown of being a felon in possession of a firearm. Law enforcement discovered the firearm during a traffic stop of his vehicle.

Brown appeals the district court's[1] denial of his motion to suppress the weapon and other evidence found during the traffic stop. He argues that the district court erroneously denied his suppression motion because law enforcement lacked a reasonable suspicion that he was engaged in criminal activity and lacked probable cause to believe that he had committed a traffic violation. We affirm.

## I. *Background*

Detective Chris Papineau of the Columbia Police Department (CPD) received information from a reliable confidential informant (CI) that Bridget Hartley was selling cocaine and marijuana at her place of employment, Parkade Plaza. The CI alleged that Hartley kept the drugs in her black backpack and was associated with a silver Chrysler Pacifica. A federal defendant corroborated the CI's information, stating that Hartley was selling drugs on Brown's behalf.

On November 23, 2020, Detective Papineau and other law enforcement officers surveilled Brown and Hartley. They saw Hartley leave a residence carrying a black backpack. Brown was with her. Brown and Hartley got into a silver Chrysler Pacifica. The officers followed Brown and Hartley for about an hour and a half. The vehicle made stops at Hartley's mother's house, an address associated with Brown, and a convenience store.

Instead of a normal license plate, the silver Chrysler Pacifica bore a dealer tag registered to Royal Motors, a car dealership. Detective Papineau knew that a license plate search conducted on November 19, 2020, had revealed that the license plate was registered to Royal Motors. During his several days of surveillance, Detective Papineau never saw Hartley or Brown return to Royal Motors.

---

[1]The Honorable Nanette K. Laughrey, United States District Judge for the Western District of Missouri.

Detective Papineau was aware of a an incident on October 4, 2020, involving Brown and the then-owner of Royal Motors. In the incident, the CPD and the Missouri State Highway Patrol were investigating a vehicle with stolen license plates abandoned on the side of a highway. When the CPD arrived, Brown was at the scene. The vehicle belonged to the then-owner of Royal Motors. The police spoke to Royal Motors's owner. He informed them that the vehicle was a personal vehicle without plates that he had loaned to Brown. When asked why he did not put Brown in a company vehicle, the owner expressed a lack of trust in Brown due to past history. Detective Papineau had reviewed body camera footage showing the interview of the Royal Motors owner. Detective Papineau also knew that the owner had subsequently passed away.

On November 24, 2020, Detective Papineau and other law enforcement officers conducted surveillance at Parkade Plaza. They saw Hartley exit and reenter the building multiple times over several hours. Each time, she carried her black backpack. Brown collected Hartley from Parkade Plaza in the silver Chrysler Pacifica. Several officers in both marked and unmarked vehicles followed the silver Chrysler Pacifica. It was raining. Detective Papineau observed Brown driving the vehicle. Its windshield wipers were on, but its headlights were not. Government surveillance footage confirmed that the vehicle's windshield wipers were on when it left Parkade Plaza.

Detective Papineau suspected that the silver Chrysler Pacifica was unregistered and that Brown was not using the Royal Motors dealer tags for business purposes. He thought it unlikely that someone driving a vehicle with a dealer plate for several days would be taking a test drive or transporting the vehicle for maintenance purposes.

The law enforcement officers communicated to one another during the surveillance about the lack of vehicle registration and headlights usage. Detective Papineau instructed CPD Detective Bradley Overton, who was driving a marked patrol car, to stop the silver Chrysler Pacifica. In his report, Detective Overton

documented that Detective Papineau instructed him to stop the silver Chrysler Pacifica because of a concern that it was not properly registered. Detective Overton was driving a marked patrol vehicle, with Detective Michael Kile riding as a passenger.

Rain continued to fall when Detective Overton stopped the vehicle. Detective Overton had his vehicle's windshield wipers on, and oncoming vehicles had their wipers and headlights on. Detective Michael Kile, who was riding as Detective Overton's passenger, observed that the silver Chrysler Pacifica's taillights were off. He surmised that the headlights must be off, too. Government surveillance footage shows that the silver Chrysler Pacifica had its taillights off at Parkade Plaza. Detective Overton's dashcam video shows that the taillights were off until just before Detective Overton activated his siren.

Detective Overton activated his emergency lights and siren. Brown continued driving for a short period before pulling over. Brown turned on the windshield wipers as he pulled over for the traffic stop. The officers smelled marijuana when they got out of their vehicles. Detective Overton got Brown out of the vehicle. Detective Kile then frisked Brown and found a firearm in his waistband. Officers searched the vehicle and found another firearm, marijuana, and cocaine.

Detective Papineau contacted Royal Motors the day after the traffic stop. He spoke with Amber Minton, the new owner. Minton told Detective Papineau that she had given Brown permission to drive the vehicle. Minton provided Brown with the Royal Motors dealer plates. Detective Papineau learned from Minton that Brown was a Royal Motors employee.

A federal grand jury indicted Brown on a charge of felon in possession of a firearm. Brown moved to suppress evidence discovered during the traffic stop. He challenged the constitutionality of the stop. He did not, however, challenge the

-4-

subsequent frisk or vehicle search. Brown argued that law enforcement lacked "the requisite suspicion of criminal activity" to initiate the stop because "[l]aw enforcement did not observe Brown commit or engage in any criminal wrongdoing" and "had no information that would warrant a prudent person to believe that a crime was committed to justify the traffic stop." R. Doc. 28, at 3–4. He also argued that "there was no probable cause to stop the vehicle for a traffic violation for not utilizing its headlights" because Detective Overton "made no mention of the Vehicle not having on its headlights as a justification for the traffic stop" and "no rain could be seen striking the Vehicle at the time of the traffic stop as documented by the officers' body cameras." *Id.* at 4.

Following an evidentiary hearing, the magistrate judge concluded that "the traffic stop was . . . supported by reasonable suspicion that Mr. Brown violated state vehicle registration and license plate laws." R. Doc. 55-1, at 7. The magistrate judge found that Detective Papineau rationally inferred from the objective and particularized facts that Brown could not lawfully operate a vehicle with Royal Motors dealer tags. First, Detective Papineau knew "that the previous month, October 2020, Mr. Brown borrowed a vehicle from Royal Motors, the vehicle's owner told police the vehicle did not have license plates when he made the loan, and the vehicle bore stolen license plates when Mr. Brown was found with it off of Highway 40." *Id.* Second, "Detective Papineau . . . knew the owner of Royal Motors had said he would never allow Mr. Brown to drive a company vehicle." *Id.* at 8. Third, "Detective Papineau observed Mr. Brown driving the Chrysler on two consecutive days without taking it to Royal Motors, other businesses, or a maintenance facility, but using it to visit multiple residences, a convenience store, and Parkade Plaza." *Id.*

These facts, the magistrate judge concluded, showed that "Detective Papineau made a rational inference that Mr. Brown borrowed a vehicle with dealer tags for personal use or affixed dealer tags to a vehicle to which they did not belong." *Id.* Based on this inference, Detective Papineau could reasonably suspect "that Mr.

Brown had violated Mo. Ann. Stat. §§ 301.130(5) (requiring vehicle to display their proper license plates), 301.020(1) (requiring owners to register their vehicles), or 301.560(7) (prohibiting the display of dealer plates on a vehicle loaned to others)." *Id.* The magistrate judge determined that "[b]ecause Detective Papineau ordered the traffic stop based on reasonable suspicion of criminal activity, what the officers who conducted the stop observed or knew is immaterial to the reasonable suspicion determination." *Id.* at 8.

Additionally, the magistrate judge determined that the stop was supported by probable cause to believe that Brown violated Mo. Ann. Stat. § 307.020(9) (requiring a driver to use headlights "any time the weather conditions require usage of the motor vehicle's windshield wipers to operate the vehicle in a careful and prudent manner"). The magistrate judge found that "[t]he officers' testimony and dashcam video strongly indicate that Mr. Brown was . . . driving without headlights in the rain." R. Doc. 55-1, at 9. First, "Detective Papineau testified that he directly observed Mr. Brown driving the silver Chrysler Pacifica in the rain without headlights." *Id.* Second, "Officer Overton's dashcam video shows that it was raining when they tailed Mr. Brown's vehicle, they had their windshield wipers on, and oncoming vehicles had their windshield wipers and headlights on." *Id.* Third, "Detective Kile observed that Mr. Brown's taillights were off, from which he reasonably concluded that the headlights were off." *Id.* Fourth, "[s]urveillance footage substantiates that Mr. Brown's taillights were off when he left Parkade Plaza and when he was being tailed by Detective Overton, until moments before Detective Overton activated his siren." *Id.*

The district court adopted the magistrate judge's report and recommendation to deny the motion to suppress. After the district court denied the suppression motion, Brown proceeded to trial. The jury found him guilty of being a felon in possession of a firearm.

## II. *Discussion*

Brown challenges the district court's denial of his suppression motion. First, he argues that law enforcement lacked reasonable suspicion that he was engaged in criminal activity because he was lawfully operating the vehicle with a Royal Motors dealer plate. Second, he argues that law enforcement lacked probable cause to believe he committed a traffic violation because Missouri law did not require him to turn on the vehicle's headlights because he was not using its windshield wipers.

A mixed standard of review applies to a district court's denial of a suppression motion: "We review factual findings for clear error, while we review *de novo* the ultimate conclusion of whether the Fourth Amendment was violated." *United States v. Brown*, 60 F.4th 1179, 1182 (8th Cir. 2023).

"The Fourth Amendment protects against unreasonable searches and seizures. A traffic stop is a reasonable seizure if it is supported by probable cause or reasonable suspicion of criminal activity." *Id.* "It is well established that *any* traffic violation, regardless of its perceived severity, provides an officer with probable cause to stop the driver." *United States v. Holly*, 983 F.3d 361, 364 (8th Cir. 2020) (internal quotation marks omitted). An officer has reasonable suspicion "to initiate a brief investigative traffic stop when he has a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020) (internal quotation marks omitted). An officer's "mere hunch" of criminal activity is insufficient to create reasonable suspicion. *Id.* (internal quotation marks omitted). But "the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Id.* (internal quotation marks omitted). "The standard depends on the factual and practical considerations of everyday life on which *reasonable and prudent men*, not legal technicians, act." *Id.* at 1188 (internal quotation marks omitted). Applying this standard, courts "must permit officers to make commonsense judgments and inferences about human

behavior." *Id.* (internal quotation marks omitted). "The standard takes into account the totality of the circumstances—the whole picture." *Id.* at 1191 (internal quotation marks omitted). Therefore, "we [must] look to the totality of the circumstances" "[i]n analyzing whether an officer had reasonable suspicion." *Brown*, 60 F.4th at 1182. "Even an officer's incomplete initial observations may give reasonable suspicion for a traffic stop, and mistakes of law or fact, if objectively reasonable, may still justify a valid stop." *Holly*, 983 F.3d at 364 (cleaned up). Officers need not be perfect to be reasonable, and the Fourth Amendment "allows for some mistakes on [their] part . . . , giving them fair leeway for enforcing the law in the community's protection." *Id.* (internal quotation marks omitted).

Under the "collective knowledge doctrine," the "collective knowledge of law enforcement officers conducting an investigation is sufficient to provide reasonable suspicion, and the collective knowledge can be imputed to the individual officer who initiated the traffic stop when there is some communication between the officers." *United States v. Mosley*, 878 F.3d 246, 254 (8th Cir. 2017) (quoting *United States v. Thompson*, 533 F.3d 964, 969 (8th Cir. 2008))."The patrol officer himself need not know the specific facts that caused the stop. Rather, the officer need only rely upon an order that is founded on reasonable suspicion." *United States v. Jacobsen*, 391 F.3d 904, 907 (8th Cir. 2004) (citation omitted) (affirming denial of a motion to suppress because the agent who ordered the traffic stop had reasonable suspicion of criminal activity).

We have previously held that an officer's "decision to stop [a vehicle] was consistent with the Fourth Amendment, [where] it was supported by reasonable suspicion to believe that the operator of the [vehicle] violated [a state's] vehicle registration statutes." *United States v. Sanchez*, 572 F.3d 475, 478 (8th Cir. 2009). Here, the district court determined that the detectives had reasonable suspicion to believe that Brown was unlawfully operating a vehicle with a dealer license plate in violation of Missouri law.

Under Missouri law, a car dealer need not register vehicles displaying dealer plates. Mo. Ann. Stat. § 301.560.3 ("The issuance of [a] distinctive dealer license number or certificate of number shall be in lieu of registering each motor vehicle . . . dealt with by a . . . manufacturer, public motor vehicle auction, wholesale motor vehicle dealer, wholesale motor vehicle auction or new or used motor vehicle dealer."). But Missouri law limits who can use vehicles with dealer plates and their purposes when used. *See* Mo. Ann. Stat. § 301.560.7. Dealer plates

> may be displayed on any motor vehicle . . . owned and held for resale by a motor vehicle dealer for use by a customer who is test driving the motor vehicle, for use by any customer while the customer's vehicle is being serviced or repaired by the motor vehicle dealer, for use and display purposes during, but not limited to, parades, private events, charitable events, or for use by an employee or officer, *but shall not be displayed on any motor vehicle or trailer hired or loaned to others or upon any regularly used service or wrecker vehicle.*

*Id.* (emphasis added); *see also* Mo. Code Regs. Ann. tit. 12, § 10-26.060(3)–(6) (2020). Missouri law authorizes police to seize dealer plates upon probable cause to believe they are being misused. Mo. Ann. Stat. § 301.560.9 ("If any law enforcement officer has probable cause to believe that any license plate or certificate of number issued under subsection 3 or 6 of this section is being misused in violation of subsection 7 or 8 of this section, the license plate or certificate of number may be seized and surrendered to the department.").

At the time of the stop, Detective Papineau knew the following: (1) a little over a month prior to the stop, the then-owner of Royal Motors loaned Brown a personal vehicle without license plates, and the police had found stolen plates on that vehicle; (2) the then-owner of Royal Motors told the police that he would not loan Brown a company car to drive; (3) the owner of Royal Motors had subsequently passed away; (4) during several days of surveillance, Brown did not drive the vehicle to or from the

dealership, as would be expected of someone test driving a car; and (5) the license plate on the vehicle was registered to Royal Motors.

These facts known to Detective Papineau at the time of the traffic stop enabled him to rationally infer that Brown was not lawfully operating a vehicle with Royal Motors dealer plates based on what occurred the prior month; that is, Brown borrowed a vehicle with dealer tags for personal use or affixed dealer tags to a vehicle to which they did not belong. This conduct, in turn, could give rise to a reasonable suspicion that Brown had violated Mo. Ann. Stat. §§ 301.130(5) (requiring vehicles to display their proper license plates), 301.020(1) (requiring owners to register their vehicles), or 301.560(7) (prohibiting the display of dealer plates on a vehicle loaned to others). In conducting the traffic stop of Brown, Detectives Overton and Kile "rel[ied] upon [Detective Papineau's] order that [was] founded on reasonable suspicion." *Jacobsen*, 391 F.3d at 907.

On appeal, Brown asks the court to focus on facts not known to Detective Papineau at the time of the stop: (1) Brown was an employee of Royal Motors, and (2) the new owner of Royal Motors, Amber Minton, gave Brown permission to operate the vehicle. But "[t]o determine if probable cause or reasonable suspicion existed, we look at what the officers 'reasonably knew at the time,' rather than looking back with the benefit of hindsight." *United States v. Hanel*, 993 F.3d 540, 543 (8th Cir. 2021) (quoting *United States v. Hollins*, 685 F.3d 703, 706 (8th Cir. 2012)).

As previously explained, "[m]istakes of law or fact, if objectively reasonable, may still justify a valid stop." *Id.* (alteration in original) (quoting *Hollins*, 685 F.3d at 706). Detective Papineau's "subjective intent is not determinative in deciding whether the stop was reasonable." *Id.* (quoting *United States v. Mallari*, 334 F.3d 765, 767 (8th Cir. 2003)). "Even if [Detective Papineau] invoke[d] the wrong offense at the time, probable cause may still support the stop if an officer has an objective

basis to make it." *Id.* at 544 (cleaned up). Furthermore, "[t]he reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques." *United States v. Sokolow*, 490 U.S. 1, 11 (1989) (explaining that "[s]uch a rule would unduly hamper the police's ability to make swift, on-the-spot decisions . . . and it would require courts to indulge in unrealistic second-guessing" (internal quotation marks omitted)).

Brown also argues that the traffic stop was unconstitutional because it was a pretext to search the vehicle for drugs. Law enforcement was surveilling Brown's vehicle as part of a narcotics investigation. During the surveillance, an officer reasonably believed he observed Brown commit a traffic violation. The traffic violation gave law enforcement reasonable suspicion to conduct the traffic stop based on knowledge and observations unrelated to the surveillance. *See Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

## III. *Conclusion*

Accordingly, we hold that under the facts known to law enforcement at the time of the traffic stop, they could have reasonably suspected Brown violated Missouri law regulating display of license plates. Therefore, the traffic stop was objectively reasonable.[2] We affirm the judgment of the district court.[3]

_____

[2]Because we hold that law enforcement had reasonable suspicion to stop the vehicle for the license plate display infraction, we need not address whether probable cause existed to stop the vehicle for Brown's failure to turn on his headlights.

[3]We also deny Brown's motion for appointment of new counsel.