*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 24-CF-0386

BRIAN K. WILLIAMS, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2023-CF2-002495)

(Hon. Errol R. Arthur, Trial Judge)

(Submitted December 11, 2025                    Decided April 9, 2026)

*Richard P. Goldberg* was on the brief for appellant.

*Edward R. Martin, Jr.*, United States Attorney at the time the brief was filed, and *Chrisellen R. Kolb*, *John P. Mannarino*, *Molly K. Smith*, and *Daniel J. Lenerz*, Assistant United States Attorneys, were on the brief for appellee.

Before DEAHL, HOWARD, and SHANKER, *Associate Judges*.

SHANKER, *Associate Judge*: On an April evening in 2023, Metropolitan Police Department (MPD) Investigators Wilfredo Guzman and Reginald Hildebrandt were patrolling in an unmarked car near 22nd Street Southeast in the District. The officers approached a car parked in an apartment complex lot, with its headlights on and an individual, later identified as appellant Brian K. Williams, in the driver's seat.

The officers initially engaged Mr. Williams in conversation while sitting in their police car but then stepped out of the car and moved closer to Mr. Williams. From this closer position, while shining a flashlight on Mr. Williams, Investigator Guzman saw a rectangular object on the right side of Mr. Williams's groin area that he thought was too thin to be a cell phone and not a part of Mr. Williams's "anatomy." At that point, based on his experience, Investigator Guzman "believed" that Mr. Williams had a gun and intended to frisk him.

Investigator Guzman asked Mr. Williams several questions about whether he was in possession of any contraband. After Mr. Williams repeatedly denied having any contraband, Investigator Guzman asked if he could "make sure" the object he saw on Mr. Williams's right side was not a gun. In response, Mr. Williams told Investigator Guzman not to touch him and fled. He was quickly apprehended by another group of officers who, shortly after, found a gun in Mr. Williams's pants and arrested him.

Prior to his trial for multiple firearms offenses, Mr. Williams moved to suppress all evidence obtained incident to his arrest. The trial court denied Mr. Williams's motion, concluding that the officers had reasonable articulable suspicion to seize him. We agree that the police had reasonable articulable suspicion to seize Mr. Williams. Consequently, we conclude that the gun found by police was not the

fruit of an illegal seizure and Mr. Williams's motion to suppress was properly denied. Therefore, with the exception of his conviction for possession of a large capacity magazine feeding device, we affirm Mr. Williams's convictions.[1]

## I. Factual and Procedural Background

We distill the background below from the trial court's factual findings and, where necessary, evidence from the suppression hearing. *See Mayo v. United States*, 315 A.3d 606, 616-17 (D.C. 2024) (en banc).

### A. Mr. Williams's Arrest

Shortly before 7:00 p.m. on an April evening in 2023, Investigator Guzman and his partner Investigator Hildebrant were patrolling in an unmarked police vehicle in the vicinity of 22nd Street Southeast. Both officers were part of the Violent Crime Impact Team (VCIT) (formerly known as the Gun Recovery Unit), the mission of which is to prevent violent crimes with a focus on seizing illegal firearms. Both officers wore plain clothes with protective vests that had patches containing their names, the word "police," and their badges on them. They also had

---

[1] After Mr. Williams's appeal was submitted to this court for consideration, the United States moved under D.C. Code § 17-306 to vacate his conviction for possession of a large-capacity ammunition feeding device in violation of D.C. Code § 7-2506.01(b). We address this motion below.

their guns on their hips, with magazine pouches, and their body-worn cameras (BWC) were visible.

The officers saw a car parked in front of an apartment building with its headlights on. Investigator Guzman noticed an individual, later identified as Mr. Williams, in the driver's seat of the car. As the officers pulled their car into the lot, Mr. Williams started getting out of his vehicle. Although it was still light outside, Investigator Guzman, while still in the unmarked police car, used his flashlight to look inside the vehicle. He then parked the car perpendicular to Mr. Williams's vehicle, which was parked with its front end facing out of a parking space. Two cars were parked on either side of Mr. Williams's vehicle. Investigator Guzman stated that he "parked almost in front of" Mr. Williams. The trial court found that the police car partially blocked Mr. Williams's car into the spot, preventing him from driving straight out but leaving enough room for him to pull out if he turned to the right.

Although there is no audio at this point in the BWC footage, Investigator Guzman started speaking with Mr. Williams while he was still in his police car; when the BWC audio began, Investigator Guzman was mid-conversation with Mr. Williams. Both officers stepped out of their car, with Investigator Guzman standing directly in front of Mr. Williams and Investigator Hildebrant moving toward the

passenger side of Mr. Williams's car.  Mr. Williams left the front, driver's side door open while he engaged with the officers.  Although it is not clear from the record what Investigator Guzman said initially, the first recorded part of their conversation reflects Mr. Williams saying, "You can check the car and all that."  Mr. Williams then told the officers that he had recently gotten the car and that it was brand new.

As this conversation was taking place, Investigator Guzman stepped closer to Mr. Williams and stopped right next to the open driver's side door.  At the same time, Mr. Williams turned his body slightly to the right, away from the officers, which Investigator Guzman described as "blading."  Investigator Guzman then observed, when shining his flashlight on Mr. Williams, a rectangular object on the right side of Mr. Williams's groin area that he thought was too thin to be a cell phone and not a part of Mr. Williams's "anatomy."  At that point, based on his experience, Investigator Guzman "believed" that Mr. Williams had a gun and intended to frisk him.

Investigator Guzman leaned to his left to get a "better view" of the rectangular object and asked Mr. Williams, "You don't got nothing on you, sir?"  Mr. Williams replied, "I don't have nothing on me, sir."  Investigator Guzman then asked, "What is that on your right side?"  Mr. Williams responded, "That's nothing, sir."  The officer said "for real?" and Mr. Williams reiterated, "That's nothing, sir."

Investigator Guzman then shut Mr. Williams's car door and asked if he could "make sure" the object was not a gun. As Investigator Guzman approached, Mr. Williams told the officer not to touch him and started to run away. Investigator Guzman told Mr. Williams to stop, but Mr. Williams fled towards the apartment building that was behind him.

After a short chase, other VCIT officers who were positioned on the other side of the apartment building apprehended Mr. Williams. Shortly after apprehending Mr. Williams, officers found a firearm in his pants and arrested him.

## B.     The Trial Court Proceedings

The government charged Mr. Williams with unlawful possession of a firearm (prior conviction) (FIP) (D.C. Code § 22-4503(a)(1)); carrying a pistol without a license (CPWL) (D.C. Code § 22-4504(a)(2)); possession of a large-capacity ammunition feeding device (PLCFD) (D.C. Code § 7-2506.01(b)); possession of an unregistered firearm (UF) (D.C. Code § 7-2502.01(a)); and unlawful possession of ammunition (D.C. Code § 7-2506.01(a)(3)). Before trial, Mr. Williams moved to suppress all evidence obtained incident to his arrest because, according to him, the police seized him without reasonable suspicion of wrongdoing in violation of the Fourth Amendment.

Following a suppression hearing, the trial court denied Mr. Williams's motion (and subsequently denied a motion for reconsideration). The court found that Investigator Guzman was a "credible" witness whose "testimony was entirely consistent with the body camera footage," and it relied on his testimony for its factual findings. The court found that Mr. Williams was seized by police when Investigator Guzman placed his hands on Mr. Williams's car and moved in to frisk him. In determining whether Investigator Guzman had reasonable suspicion to seize Mr. Williams, the court focused on the rectangular object the officer saw near Mr. Williams's groin area and the high crime rate in the area where Mr. Williams was arrested. It also noted that Mr. Williams "was blading his body" away from Investigator Guzman in "an attempt to conceal something." The court concluded that, based on the totality of these circumstances, officers had reasonable suspicion to seize Mr. Williams.

The case proceeded to a stipulated trial, after which the trial court found Mr. Williams guilty on all five counts. The court sentenced Mr. Williams to a total of eighteen months in prison, to be followed by three years of supervised release. This appeal followed.

## II.     Analysis

### A.     Police Had Reasonable Articulable Suspicion
to Seize Mr. Williams

According to Mr. Williams, officers seized him without reasonable articulable suspicion that he was engaged in criminal activity when Investigator Guzman asked, "You don't got nothing on you, sir?"  And, in Mr. Williams's view, because the seizure was illegal, the evidence found on him—the gun and ammunition—must be suppressed.  We conclude that the officers had reasonable articulable suspicion to seize Mr. Williams and therefore affirm the trial court's order denying his motion to suppress.

### 1.     Standard of Review

We review a trial court's order regarding a motion to suppress de novo for legal issues but "generally defer to the trial court's findings of fact 'unless they are clearly erroneous.'"  *Mayo*, 315 A.3d at 616 (quoting *Hooks v. United States*, 208 A.3d 741, 745 (D.C. 2019)).  We view the evidence in the light most favorable to the trial court's ruling.  *Id.* at 617.  We are not limited, however, to the trial court's express findings and may examine the "record evidence presented at a suppression hearing to determine whether the government proved that a defendant's constitutional rights were not violated."  *Id.* (citing *Germany v. United States*, 984

A.2d 1217, 1221 (D.C. 2009)). A trial court's credibility determinations are "reviewed for clear error." *Stringer v. United States*, 301 A.3d 1218, 1228 (D.C. 2023). "[W]e are particularly unlikely to find clear error with respect to credibility determinations based on the witness's demeanor—if for no other reason than that we have no appraisal of the witness's comportment to compare against the trial court's." *Id.*; *see id.* ("Credibility findings based on first-hand observation warrant substantial deference not only because the trial court had the opportunity to assess the witness's demeanor but also because '[t]he trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise.'" (alteration in original) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985))).

## 2.    *Discussion*

The parties disagree about when Investigator Guzman seized Mr. Williams within the meaning of the Fourth Amendment and whether Investigator Guzman had reasonable suspicion for doing so. Mr. Williams contends that Investigator Guzman seized him when he asked, "You don't got nothing on you, sir?" The government, on the other hand, asserts that we should agree with the trial court's finding that Investigator Guzman seized Mr. Williams when Investigator Guzman closed the car door and indicated his intent to frisk Mr. Williams. The government argues in the

alternative that even if the seizure occurred when Investigator Guzman asked, "You don't got nothing on you, sir?" the officer had reasonable suspicion at that time.

We agree with the government that Investigator Guzman had reasonable suspicion that Mr. Williams was engaged in criminal activity at both points and therefore need not decide whether the ten-second difference in time alters the outcome under the Fourth Amendment. Assuming Investigator Guzman seized Mr. Williams when he inquired, "You don't got nothing on you, sir?" we turn to the dispositive question: whether at that time the officer had reasonable articulable suspicion that "criminal activity [was] afoot." *Arizona v. Johnson*, 555 U.S. 323, 330 (2009).

The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures. U.S. Const. amend. IV. Law enforcement officers may not seize an individual unless they have "either probable cause to arrest an individual for a crime or at least reasonable articulable suspicion that an individual is engaged in criminal conduct to effect the lesser intrusion of a brief *Terry* stop to investigate whether that is in fact the case." *Mayo*, 315 A.3d at 620 (citation modified). Thus, "even a brief restraining stop of a person by the police is an unreasonable seizure in violation of the Fourth Amendment if it is conducted for investigatory purposes without a reasonable suspicion supported by specific and

articulable facts that the individual is involved in criminal activity." *Id.* (citation modified).

"*Terry*'s reasonable articulable suspicion standard 'requires . . . considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause.'" *Id.* (quoting *Kansas v. Glover*, 589 U.S. 376, 380 (2020)). "An officer's inchoate and unparticularized suspicion or hunch of criminal activity will not suffice." *Id.* (citation modified). The standard, however, "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *United States v. Cortez*, 449 U.S. 411, 418 (1981)).

"To determine if a *Terry* stop was supported by reasonable articulable suspicion, a court must examine whether the totality of the facts available to the officer at the moment of the seizure warrant a person of reasonable caution in the belief that the stop was appropriate." *Mayo*, 315 A.3d at 620 (citation modified). Courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *Arvizu*, 534 U.S. at 273 (citing *Cortez*, 449 U.S. at 417-18). "Multiple factors may contribute to the totality of the circumstances; these include the time of

day, flight, the nature of the location, furtive hand movements, an informant's tip, a person's reaction to questioning, a report of criminal activity or gunshots, and viewing of an object or bulge indicating a weapon." *Mayo*, 315 A.3d at 621 (citation modified). In reviewing the totality of the above circumstances, we are cognizant that Investigator Guzman's "past experience is relevant" and must be accorded "due weight" when considering "specific reasonable inferences" about whether Mr. Williams was armed. *Champion v. United States*, 307 A.3d 425, 435 & n.10 (D.C. 2024) (citation modified); *see Arvizu*, 534 U.S. at 273.

Mr. Williams and the government agree that four factors are central to the reasonable suspicion analysis in this case: (1) the rectangular object Investigator Guzman observed on the right side of Mr. Williams's groin area; (2) Mr. Williams's act of turning the right side of his body away from Investigator Guzman, also known as "blading"; (3) the general locational crime evidence Investigator Guzman testified to at the suppression hearing; and (4) Mr. Williams's alleged nervousness upon first seeing the officers. We assess each factor in turn and then weigh them together to determine if Investigator Guzman's seizure of Mr. Williams was supported by reasonable articulable suspicion. *See Mayo*, 315 A.3d at 622.

First, regarding the rectangular object, generally, "a generic bulge in a pocket can be explained by too many innocent causes to constitute 'reasonable' suspicion."

*Singleton v. United States*, 998 A.2d 295, 302 (D.C. 2010). "When we and other courts have held it reasonable to infer that a bulge in a suspect's clothing was a firearm, there were additional observed facts about the bulge, the suspect's actions linked to it, and/or other circumstances that supported the inference." *Golden v. United States*, 248 A.3d 925, 942 & n.64 (D.C. 2021) (collecting cases).

Here, Investigator Guzman observed more than a "generic bulge." *See Singleton*, 998 A.3d at 302. As the trial court found, he testified that the bulge formed a thin, rectangular shape on the right side of Mr. Williams's groin area and that it was not a part of Mr. Williams's anatomy. Investigator Guzman, credibly according to the trial court, "literally believed that [Mr. Williams] was in possession of a firearm" because the bulge resembled the "receiver" or "slide" of a gun and was too "thin" to be a cell phone. This testimony was explicitly based on his "experience in recovering multiple firearms," but also implicitly based on his "specialized training" as a police officer, as demonstrated by his explanation of the various parts of a gun and how they fit together. *See Arvizu*, 534 U.S. at 273.

We see no clear error in the trial court's findings about Investigator Guzman's "observations about the character of the bulge" on Mr. Williams's groin area, and we hold that those findings support the "rational inference" that Mr. Williams was armed. *Golden*, 248 A.3d at 943; *see Arvizu*, 534 U.S. at 273 (holding that a

reviewing court must give due weight to an officer's experience and training and view the evidence as it would be understood by those in law enforcement).[2]

Mr. Williams relies on our decision in *Singleton* in arguing that the rectangular-shaped object Investigator Guzman observed should not contribute to our reasonable suspicion analysis. *Singleton*, however, does not advance Mr. Williams's cause. In that case, we expressed some hesitation about how much weight to give an officer's statement that he saw a bulge "consistent" with the shape of a firearm because the officer "did not specifically describe the shape or size of the bulge." *Singleton*, 998 A.2d at 301. Here, Investigator Guzman provided details about the shape and size of the bulge he observed on Mr. Williams, including that it was thin and rectangular and looked like a part of a firearm.

Moreover, despite the flaws in the officer's testimony in *Singleton*, we still considered the officer's observation of the bulge in our totality-of-the-circumstances

---

[2] Our review of the BWC footage, on its own, neither advances nor detracts from the trial court's findings related to the bulge Investigator Guzman saw. The footage is simply unclear on this point. At the very least, nothing in the footage indicates that the trial court's findings were "clearly erroneous"; thus, we decline to depart from the general deference we give a trial court's findings of fact. *See Mayo*, 315 A.3d at 616; *see also Hawkins v. United States*, 248 A.3d 125, 130 (D.C. 2021) (noting our obligation to conscientiously review the record, including video footage, although that obligation neither makes us finders of fact nor changes our standard of review). Similarly, we defer to the court's credibility findings on this point because neither Mr. Williams nor our review of the record identifies any potential "clear error." *See Stringer*, 301 A.3d at 1228.

analysis and held that, along with other suspicious behavior, the "combination of facts" gave the police reasonable suspicion to stop and frisk the appellant. 998 A.2d at 302; *but cf. Golden*, 248 A.3d at 943, 946 (holding that an alleged bulge on the defendant's hip had little weight in the totality of the circumstances analysis because the testifying officer "did not link the nondescript bulge" to any characteristics or behavior that indicated the bulge was a gun). We think it is appropriate to do the same here, especially because Investigator Guzman provided details supporting his inference that the bulge in Mr. Williams's pants was a gun. *See Golden*, 248 A.3d at 942.

Mr. Williams further cites *Singleton* to suggest that it would be improper for us to conclude that Investigator Guzman had reasonable suspicion based on the bulge alone. He is correct that we cautioned against such an approach in *Singleton*, particularly when the testifying officer provided little detail to support the inference that the observed bulge was a weapon. *See Singleton*, 998 A.2d at 302 ("[E]ven though a particular officer might believe a bulge conceals a weapon, a purely subjective impression is not an 'objective justification' that can be judicially examined against the requirements of the Fourth Amendment."). As in *Singleton*, however, here "there is more than a bulge to inform the court's examination." *Id.*

Turning to Mr. Williams's "blading" conduct, "[i]n cases like this in which the defendant's behavior suggests an attempt to conceal something from police, reasonable suspicion does not require unmistakable evidence that what the defendant was trying to hide was a weapon." *Champion*, 307 A.3d at 431. "Assessing particularized suspicion 'does not deal with hard certainties, but with probabilities.'" *Id.* (quoting *Cortez*, 449 U.S. at 418). "On the other hand, the totality of the circumstances must contain at least some indication that the concealed item is a weapon, and reasonable suspicion will rarely if ever be established solely by evidence that the defendant appeared to be concealing *something.*" *Id.* at 432; *see also Hawkins v. United States*, 248 A.3d 125, 131 (D.C. 2021) (holding that, despite the defendant's furtive hand movements towards his satchel, the police lacked reasonable suspicion that the defendant possessed a weapon when "the officer did not claim to have seen a telltale bulge or any part of a weapon").

The trial court credited Investigator Guzman's testimony that Mr. Williams was "blading his body" away from the officer in what Investigator Guzman thought was an attempt to conceal a firearm. The court also found that Investigator Guzman's BWC footage supported this finding. The footage shows that Mr. Williams was initially facing squarely towards Investigator Guzman. As Investigator Guzman got closer, Mr. Williams turned his body slightly to the right, away from the officers. Investigator Guzman, immediately before asking Mr.

Williams whether he had something on him, leaned to the left to get "a better view" of the rectangular object he saw in Mr. Williams's groin area.

We see nothing clearly erroneous about the trial court's findings that Mr. Williams "bladed" and that he was trying to conceal a weapon. *See Champion*, 307 A.3d at 431-32. The blading is therefore a circumstance we consider in the totality.

Next, "[t]here is no question that locational evidence about criminal activity presented by the government can be a relevant consideration in a *Terry* analysis." *Mayo*, 315 A.3d at 632. "[T]he exclusive focus in assessing general locational crime information should be on the particular details that make an individual's actions more or less suspicious when viewed in context." *Id.* at 634. The evidence about crime in a location "must be relevant to the conduct at issue." *Id.* Our inquiry is "fact-intensive" and "should turn on the quality and specificity of the information, with particular focus on the recency, frequency, and geographic proximity of the relevant criminal activity." *Id.* at 635.

At the suppression hearing, the government first presented evidence that the entire area east of the Anacostia River was known for its violent crime. The trial court rightly found this evidence unpersuasive because it was not relevant to the particular crime at issue, *see id.* at 634, and it provided the court with no specifics

about the recency, frequency, or geographic scope of the relevant criminal activity, *see id.* at 635.

The government also presented evidence that 22nd Street Southeast was "known for its violent activity," including "multiple shootings [and] multiple sounds of gunshots." Investigator Guzman testified that within the "same week" as Mr. Williams's arrest there were "a few shootings" in the area "surrounding" 22nd Street and that he was patrolling that area specifically in response to this activity. The government then introduced an exhibit showing a map of 22nd Street and the streets around it, and Investigator Guzman confirmed that the area was known for "its violent crime." The trial court found that the area Investigator Guzman referred to when he said it was known for violent crime was "22nd Street" and "the area that's bounded by Savannah Street, 21st and 22nd Street." It further determined that the officers were in this area for "a specific purpose"—"violent activity [and] a number of shootings"—and were not "traveling one of the four quadrants of the city and they just happened on 22nd Street." The trial court found this evidence credible and determined that it weighed in favor of finding reasonable suspicion.

Investigator Guzman's testimony, although limited in detail, contained enough specificity to place the circumstances surrounding Mr. Williams's arrest "in a different light." *Id.* at 636. In particular, the combination of Investigator

Guzman's testimony and the government's exhibit provided specific geographic boundaries as to where the relevant criminal activity occurred. *Cf. id.* (concluding that government's general locational crime information was not sufficiently specific when the testifying officer did not provide geographic boundaries when describing the criminal activity he had witnessed). There had been a "few shootings" in this approximately one-block radius around 22nd Street Southeast within the same week in which Mr. Williams was arrested. While more data about the number of shootings would have been more informative, this testimony provides at least some temporal context regarding the recency of gun violence in this area. *See id.* at 635.

Thus, we conclude that the evidence the government presented did more than simply label the area around 22nd Street Southeast as "high crime" and included "nonconclusory details about crime in the location in which" Mr. Williams was arrested. *Id.* at 632-33; *see also Washington v. State*, 287 A.3d 301, 330 (Md. 2022) ("Testimony must identify a location or geographic area, not an overly broad region, and particular criminal activity occurring in the not-too-distant past, to support the conclusion that the location is indeed a high-crime area."). Accordingly, the general locational crime information is relevant to our *Terry* analysis and provides some useful context for Investigator Guzman's observations of Mr. Williams. *See Mayo*, 315 A.3d at 632.

Finally, the government argues that Mr. Williams's "initial nervousness" upon seeing officers should contribute to our totality of the circumstances analysis. The trial court neither made factual findings about Mr. Williams's alleged nervousness nor relied on nervousness in concluding that Investigator Guzman had reasonable suspicion. We too decline to consider Mr. Williams's alleged nervous behavior.

Numerous cases from this court and other jurisdictions have cast doubt on "the probative value in the reasonable suspicion analysis of nervousness in the presence of police." *Golden*, 248 A.3d at 945 & n.80 (collecting cases). Moreover, whether Mr. Williams showed signs of nervousness is not clear from the record. Investigator Guzman initially testified that Mr. Williams appeared "very spooked" when he first saw the officers and "appeared very nervous" with "a wide-eyed expression as he was stepping out [of his car.]" After his BWC footage was played at the suppression hearing, however, Investigator Guzman admitted on cross-examination that Mr. Williams did not appear nervous in the video. Although he insisted that Mr. Williams looked nervous when he observed him sitting in his car, Investigator Guzman also conceded that this nervousness disappeared in the few seconds between that observation and when Mr. Williams started speaking with the officers.

Even assuming that Mr. Williams showed signs of nervousness when Investigator Guzman first observed him, "it is common for most people to exhibit signs of nervousness when confronted by a law enforcement officer whether or not the person is currently engaged in criminal activity." *United States v. Brinkley*, 980 F.3d 377, 391 (4th Cir. 2020) (citation modified). Mr. Williams's lack of nervousness when actually engaging with the officers is, to us, far more indicative of how this factor should weigh in the totality of the circumstances. *Cf. Singleton*, 998 A.2d at 302 (weighing suspect's nervous behavior in favor of finding reasonable suspicion when behavior occurred after the suspect saw the police officers). Therefore, we conclude that any alleged nervousness shown by Mr. Williams provides negligible support for the government's argument that Investigator Guzman had a lawful basis to seize Mr. Williams.

"The Supreme Court has 'repeatedly' taught that when making 'reasonable-suspicion determinations,' reviewing courts 'must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing.'" *Pleasant-Bey v. United States*, 988 A.2d 496, 500 (D.C. 2010) (quoting *Arvizu*, 534 U.S. at 273). "*Terry*, in

other words, precludes a divide-and-conquer analysis because the whole may sometimes be more than the sum of its parts." *Id.* (citation modified).

When "[v]iewing the totality of the circumstances from the perspective of a reasonable, cautious, and experienced police officer on the scene," *Golden*, 248 A.3d at 946, we conclude that Investigator Guzman had objectively reasonable grounds to suspect that Mr. Williams was "involved in criminal activity[,]" *Mayo*, 315 A.3d at 620; *see also id.* ("*Terry*'s reasonable articulable suspicion standard 'requires . . . considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause.'" (quoting *Glover*, 589 U.S. at 380)). Taken together, (1) Investigator Guzman's observation of the rectangular object near Mr. Williams's right groin, (2) Mr. Williams's shifting of his body away from officers, and (3) the general locational crime evidence were enough to give Investigator Guzman reasonable articulable suspicion that Mr. Williams was engaged in criminal activity. *See id.* Consequently, the gun, ammunition, and magazine found on Mr. Williams were not the fruit of an illegal search and the trial court properly denied his motion to suppress that evidence. *See Terry v. Ohio*, 392

U.S. 1, 30-31 (1968). Because this was Mr. Williams's sole challenge to his FIP, CPWL, UF, and unlawful possession of ammunition convictions, we affirm all four.

### B. The Government's Motion

Also pending before us is the government's unopposed motion to vacate Mr. Williams's conviction for possession of a large-capacity ammunition feeding device in violation of Section 7-2506.01(b). The government seeks vacatur of this conviction because it is of the view that Section 7-2506.01(b) is unconstitutional. Mr. Williams neither independently challenges the constitutionality of the PLCFD statute nor argues that any constitutional infirmity in the statute impacts any of his other convictions; either point might otherwise militate in favor of us resolving the constitutional question despite the unopposed vacatur request. In light of that, and the lack of any opposition, we grant the government's motion and vacate Mr. Williams's PLCFD conviction.[3]

---

[3] This court recently held that the District's ban on high-capacity magazines is unconstitutional in *Benson v. United States*, No. 23-CF-514, 2026 WL 628772 (D.C. Mar. 5, 2026). Mr. Williams did not raise a similar challenge to the PLCFD statute in this case, and he similarly has not raised any argument that any of his other convictions were "infected" by the unconstitutionality of that ban. *Id.* at *17. In any event, it is plain enough that all of Mr. Williams's other convictions survive *Benson*'s analysis, because Mr. Williams has a prior felony conviction, which is the type of "independent basis" that *Benson* recognized might justify precluding him from registering or licensing a firearm in the District. *See, e.g.*, D.C. Code

## III.  Conclusion

For the foregoing reasons, we affirm Mr. Williams's FIP, CPWL, UF, and unlawful possession of ammunition convictions, vacate Mr. Williams's PLCFD conviction, and remand the case for further proceedings.

*So ordered.*

---

§§ 22-4503(a)(1), 22-4504(a)(2) & 7-2506.01(a)(3); *cf. Benson*, 2026 WL 628772, at *18.